Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

--oOo--

TRAVELERS CASUALTY INSURANCE  )
COMPANY OF AMERICA, a         )
Connecticut corporation,      )
                              ) No. 2:12-cv-00481-EJL
          Plaintiff,          )
                              )
vs.                           )
                              )
WILD WATERS, LLC, an Idaho    )
limited liability company, and)
RIVER HOUSE, LLC, an Idaho    )
limited liability company,    )
                              )
          Defendants.         )
_____)


DEPOSITION OF TIM WARNER

Spokane, Washington

May 17, 2013


CDA Reporting Court Reporters
401 Front Avenue, Suite 215
Coeur d'Alene, Idaho  83814
ID 208.765.3666  Fax 208.676.8903  WA 509.703.6600
Toll Free 888-894-CDAR   www.cdareporting.com


REPORTED BY:  ANITA W. SELF, WA CCR #3032, RPR

Tim Warner                                    Travelers Casualty Ins. Co. v. Wild Waters, LLC
May 17, 2013                                  Case No. 12-CV-00481-CWD

Page 2

1          BE IT REMEMBERED, that pursuant to notice, and

2      on Friday, May 17, 2013, commencing at the hour of

3      8:55 a.m. thereof, at Moloney + O'Neill, 818 W.

4      Riverside Avenue, Suite 800, Spokane, Washington 99201,

5      before me, ANITA W. SELF, a Certified Court Reporter,

6      Washington CCR No. 3032, there personally appeared

7                    TIM WARNER

8      called as a witness on behalf of the Defendant, who,

9      having been first duly sworn, was then and there

10     examined and testified as follows:

11                    --oOo--

12         MATT HEDBERG, Attorney at Law, representing

13     Bullivant Houser Bailey, PC, 888 SW Fifth Avenue,

14     Portland, Oregon 97204, appeared as counsel on behalf

15     of the Plaintiff;

16         MICHAEL E. RAMSDEN, Attorney at Law,

17     representing Ramsden & Lyons, LLP, 700 Northwest

18     Boulevard, Coeur d'Alene, Idaho 83814, appeared as

19     counsel on behalf of the Defendants Wild Waters, LLC,

20     and River House, LLC; and

21         GREGORY C. HESLER, Attorney at Law,

22     representing Paine Hamblen, LLP, 717 W. Sprague Avenue,

23     Suite 1200, Spokane, Washington 99201, appeared as

24     counsel on behalf of the Defendant, Lavin Trust.

25                    --oOo--

Tim Warner
May 17, 2013

Travelers Casualty Ins. Co. v. Wild Waters, LLC
Case No. 12-CV-00481-CWD

---

Page 2

1    BE IT REMEMBERED, that pursuant to notice, and
2 on Friday, May 17, 2013, commencing at the hour of
3 8:55 a.m. thereof, at Moloney + O'Neill, 818 W.
4 Riverside Avenue, Suite 800, Spokane, Washington 99201,
5 before me, ANITA W. SELF, a Certified Court Reporter,
6 Washington CCR No. 3032, there personally appeared
7        TIM WARNER
8 called as a witness on behalf of the Defendant, who,
9 having been first duly sworn, was then and there
10 examined and testified as follows:
11        --oOo--
12    MATT HEDBERG, Attorney at Law, representing
13 Bullivant Houser Bailey, PC, 888 SW Fifth Avenue,
14 Portland, Oregon 97204, appeared as counsel on behalf
15 of the Plaintiff;
16    MICHAEL E. RAMSDEN, Attorney at Law,
17 representing Ramsden & Lyons, LLP, 700 Northwest
18 Boulevard, Coeur d'Alene, Idaho 83814, appeared as
19 counsel on behalf of the Defendants Wild Waters, LLC,
20 and River House, LLC; and
21    GREGORY C. HESLER, Attorney at Law,
22 representing Paine Hamblen, LLP, 717 W. Sprague Avenue,
23 Suite 1200, Spokane, Washington 99201, appeared as
24 counsel on behalf of the Defendant, Lavin Trust.
25        --oOo--

---

Page 3

1        I N D E X
2        INDEX OF EXAMINATION
3 EXAMINATION BY:                        Page
4    Mr. Ramsden                        4
5    Mr. Hedberg                        76
6    Mr. Ramsden (further)              82
7        EXHIBITS MARKED FOR IDENTIFICATION
8 No.        Description              Page
9 Exhibit 1    Subpoena to Testify        4
10 Exhibit 2    Insurance Summary & Policy    16
11 (removed)    September 8, 2010
12 Exhibit 2    Insurance Summary & Policy    25
13 (replaced)    September 8, 2010
14 Exhibit 3    Activity Log, 9/6/11-6/29/12    31
15 Exhibit 4    Agency File                34
16 Exhibit 4A    Acord Commercial Insurance
17            Application, 6/21/2010    35
18 Exhibit 4B    Facsimile of billing statement    40
19 Exhibit 4C    March 9, 2012 letter        48
20 Exhibit 4D    Insurance Summary, 9/6/11    55
21 Exhibit 5    Letter dated January 27, 2012    43
22 Exhibit 6    Activity Log, 9/16/08-6/29/12    45
23 Exhibit 7    Acord Property Loss Notice    58
24 Exhibit 8    Letter dated May 17, 2012    66
25 Exhibit 9    Activity Log, 11/7/07-6/26/12    72

---

Page 4

1            TIM WARNER,
2        having been first duly sworn,
3        was examined and testified as follows:
4            EXAMINATION BY
5 MR. RAMSDEN:
6    Q.  Will you tell us your name, please?
7    A.  Tim Warner.
8    Q.  Tim, what do you do for a living?
9    A.  I'm an insurance agent.
10    Q.  And who do you work for?
11    A.  Moloney + O'Neill.
12    Q.  I'm Mike Ramsden, we introduced each other
13 before we started, and I represent Wild Waters, LLC,
14 and River House, LLC, in a lawsuit filed in Idaho
15 Federal Court by Travelers Casualty Insurance Company.
16 I sent you a subpoena to testify in this case.
17        MR. RAMSDEN:  And I'd like to mark this if I
18 can.
19        (Exhibit No. 1 was marked.)
20        MR. RAMSDEN:
21    Q.  I've marked a copy of that subpoena as
22 Exhibit 1 to the deposition.
23        Can you tell me, did you receive this by
24 personal delivery to you?
25    A.  I did.

---

Page 5

1    Q.  Okay.  And when was it that you received this?
2    A.  I'm not sure of the date.
3    Q.  Sometime ago?
4    A.  Sometime ago, yes.
5    Q.  Okay.  That subpoena asks you to bring with
6 you to this deposition the agency file for Wild Waters,
7 LLC, and River House, LLC, correct?
8    A.  Um-hmm.  Correct.
9    Q.  Okay.  And do you have that with you right
10 now?
11    A.  No, I don't.
12    Q.  Okay.  Where is it?
13    A.  Dead file.
14    Q.  Okay.  And where is dead file?
15    A.  DeVries.
16    Q.  DeVries Storage?
17    A.  Storage.
18    Q.  And somebody is apparently gathering this file
19 and bringing it back to us --
20    A.  Right now.
21    Q.  -- so we can look at it?
22    A.  Yes.
23    Q.  Tim, have you ever had your deposition taken
24 before?
25    A.  No.

2  (Pages 2 to 5)

Tim Warner
May 17, 2013

Travelers Casualty Ins. Co. v. Wild Waters, LLC
Case No. 12-CV-00481-CWD

---

**Page 10**

1   Q. Yeah. Let me break it down.
2      Did you act as an insurance agent or an
3 insurance broker in placing the insurance for Wild
4 Waters, LLC, and River House, LLC?
5   A. Well, I represent Travelers Insurance Company,
6 and I presented that quote to the customer, Wild
7 Waters, and Wild Waters purchased that quote.
8   Q. That was casualty insurance, correct?
9   A. Correct.
10   Q. Did you represent an insurance company and
11 present a quote to Wild Waters, LLC, and River House,
12 LLC, for liability insurance?
13   A. Yes.
14   Q. And which insurance company did you represent
15 for that purpose?
16   A. I don't recall which market it was. It was
17 through a wholesaler that's called Cochran Insurance.
18   Q. C-o-c-h-r-a-n?
19   A. Yes.
20   Q. And where is Cochran Insurance located?
21   A. Spokane.
22   Q. Was the liability insurance for Wild Waters,
23 LLC, and River House, LLC, in a nonstandard market?
24   A. The general liability was, yes.
25   Q. And which nonstandard market did you apply to

---

**Page 11**

1 for this insurance; liability insurance, that is?
2   A. Well, Cochran is a wholesaler so they went to
3 many markets. And every year because of the -- how
4 hard a class that is, it went to many markets.
5   Q. And with respect to the property and casualty
6 insurance with Travelers, when was the first year that
7 you represented Travelers and presented a quote for
8 insurance to Wild Waters or River House, LLC?
9   A. Well, I inherited this account from Mike
10 Schnurr when he retired.
11   Q. Would you spell Mike's last name?
12   A. S-c-h-n-u-r-r.
13   Q. When did Mr. Schnurr retire?
14   A. I think it was in 2002.
15   Q. And from 2002, then did you represent
16 Travelers and present a quote to Wild Waters, LLC, and
17 River House, LLC, for property and casualty insurance?
18     MR. HEDBERG: Objection. States a legal
19 conclusion.
20     MR. RAMSDEN:
21   Q. Go ahead and answer.
22   A. As I recall, it's been with Travelers for that
23 time, but I'm not positive when it was placed with
24 Travelers.
25   Q. And was the term of the property and casualty

---

**Page 12**

1 insurance that you placed with Travelers annual?
2   A. Yes.
3   Q. Was it always annual?
4   A. Yes.
5   Q. And was the expiration always October 5th of a
6 calendar year?
7   A. Yes.
8   Q. Does the agency file contain copies of all of
9 the insurance policies that were placed -- all of the
10 property and casualty insurance policies that were
11 placed for Wild Waters, LLC, and River House, LLC, from
12 the time you started working on the account?
13   A. Yes.
14   Q. Does the agency -- is the agency file ever
15 purged of old policies?
16   A. I do not think so. I think they're all still
17 there.
18   Q. Does the agency file also contain all
19 correspondence between Moloney + O'Neill and the
20 insureds?
21   A. Yes.
22   Q. Does the agency file also contain any notes by
23 you?
24   A. Yes.
25   Q. How do you normally keep notes in an agency

---

**Page 13**

1 file?
2   A. Either by taking notes on the summary when I'm
3 discussing it with the client or putting notes into the
4 computer file.
5   Q. And is the computer file then reduced to a
6 hard copy and placed in the agency file?
7   A. No.
8   Q. Where are the notes concerning Wild Waters,
9 LLC, and River House, LLC?
10   A. The computer notes?
11   Q. Yes.
12   A. In the computer.
13   Q. Which computer?
14   A. The network computer.
15   Q. Can you access those and print them for us?
16   A. Yeah. IT can, yes.
17   Q. Is there a reason why you haven't brought
18 those notes to the deposition in response to the
19 subpoena?
20   A. No. I could have them printed right now if
21 you'd like.
22     MR. RAMSDEN: Let's do that. We'll take a
23 break while you print the notes. If it can be done --
24     THE WITNESS: Yeah.
25     MR. RAMSDEN: -- quickly, that would be great.

---

CDA Reporting   Court Reporters
Ph.208-765-3666   Fax:208-676-8903

www.cdareporting.com
888-894-2327
47adbdbd-612d-4451-8b26-746b85a9dfd8

Tim Warner
May 17, 2013

Travelers Casualty Ins. Co. v. Wild Waters, LLC
Case No. 12-CV-00481-CWD

---

Page 14

1    THE WITNESS: Okay.
2    MR. RAMSDEN: Thanks.
3    (Brief recess was taken.)
4    MR. RAMSDEN: Let's go back on.
5  MR. RAMSDEN:
6    Q.  Thank you very much for going out and having
7  your IT person print off the notes concerning the Wild
8  Waters and River House, LLC, files.  I'll just ask you
9  some more questions until those notes show up and then
10 we'll look at them.
11   With respect to the casualty insurance, was
12 there an annual meeting for the purpose of a coverage
13 review with Wild Waters, LLC, or River House, LLC?
14   A.  Yes.  There always is an effort made to have
15 an annual meeting.  But in the last couple of years it
16 was much harder to get together with Stacey than it was
17 previous to that.  So we didn't meet face-to-face maybe
18 the last couple of years, but there was always
19 discussions on the phone.
20   Q.  And with respect to the liability insurance
21 for Wild Waters, LLC, and River House, LLC, was there
22 an effort made to have an annual meeting for a coverage
23 review?
24   A.  Yes.
25   Q.  What was the anniversary date of the liability

Page 15

1  insurance policies for Wild Waters, LLC, and River
2  House, LLC?
3    A.  It was early June, as I recall.  For the
4  general liability you're asking?
5    Q.  Yeah.  Was there more than one liability
6  insurance policy?
7    A.  No.
8    Q.  So there was a general liability policy.  Did
9  that general liability policy include risks associated
10 with the operation of a water park?
11   A.  Yes.
12   Q.  Did it include a liquor liability endorsement?
13   A.  The liquor liability we quoted a few times,
14 and I'm not sure if it was ever added because he was
15 always on the verge of getting a liquor liability, and
16 I cannot recall if he ever actually got the liquor
17 liability or not.
18   Q.  Were there any other coverages under the
19 liability insurance that -- I take it when you say
20 "he," you're referring to Stacey Lavin?
21   A.  Correct.
22   Q.  Were there any other coverages that were
23 quoted but may not actually have been obtained for the
24 liability insurance coverages?
25   A.  I'm sure we quoted him an employment practices

Page 16

1  liability policy, but that's separate from a general
2  liability policy.  But as far as a general liability
3  endorsement like a liquor liability, not that I recall.
4    Q.  Did Wild Waters, LLC, or River House, LLC,
5  ever obtain employment practices coverage?
6    A.  No.
7    Q.  Let's look at a piece of paper, or some pieces
8  of paper.
9    (Exhibit No. 2 was marked.)
10   MR. RAMSDEN:
11   Q.  Handing you what's been marked for this
12 deposition as 2, can you tell me what that is?  If you
13 want to look through it --
14   A.  Looks like the summary along with the
15 Travelers property policy.
16   Q.  And what is a summary?
17   A.  Summary of insurance where we take the limits
18 off the declaration pages and summarize them for the
19 client.
20   Q.  And this -- the first page of this says
21 September 8, 2010.  First page -- yeah, the cover page,
22 September 8, 2010.  Why is September 8, 2010, used as
23 the date?
24   A.  That's the date that it was printed.
25   Q.  Did you prepare this summary?

Page 17

1    A.  No, I did not.
2    Q.  Who did prepare it?
3    A.  Cathie Hamlin.
4    Q.  Who is Cathie Hamlin?
5    A.  Customer service rep.
6    Q.  Is it C-a-t-h-y or K-a-t-h-y?
7    A.  Her name is right here on the summary.  It's
8  Cathie, C-a-t-h-i-e.
9    Q.  And Hamlin is H-a-m-l-i-n?
10   A.  Correct.
11   Q.  All right.  And it lists you as the account
12 executive?
13   A.  Yes.
14   Q.  What is the difference between an account
15 executive and an account manager at Moloney + O'Neill?
16   A.  The account executive is the insurance agent.
17 The account manager is a person that processes the
18 paperwork.
19   Q.  So I think I understand.  Was this insurance
20 summary as it is titled used for -- well, what was the
21 purpose for creating this document?
22   A.  When you review with the client, it's
23 something that they can read and understand more easily
24 than trying to follow your discussion while looking at
25 the policy, rather than looking at the policy.

5  (Pages 14 to 17)

Tim Warner
May 17, 2013

Travelers Casualty Ins. Co. v. Wild Waters, LLC
Case No. 12-CV-00481-CWD

Page 18

1    Q.  Okay.  Was there a meeting with someone from
2  Wild Waters, LLC, and River House, LLC, on or about
3  September 8th of 2010?
4    A.  I do not recall for sure, but my recollection
5  is that I was not able to get together with Stacey the
6  last couple of years.  So there was probably not a
7  face-to-face because the last couple of years all I was
8  able to get with him was over the phone.
9    Q.  In the event that there was not a face-to-face
10  meeting, how was this insurance company (sic)
11  communicated to Stacey Lavin?
12    A.  I guess I don't understand that question.
13    Q.  Was it mailed to him?
14    A.  Oh, the policy, it -- when -- as I recall,
15  most of the policies that I was not able to get with
16  him on, I would run by the office and try to catch him,
17  and would drop it off if he wasn't there.
18    Q.  And run by the office means?
19    A.  Stop by his office and drop the policy off if
20  he was not there.
21    Q.  Where was Stacey's office?
22    A.  The south hill.
23    Q.  Do you remember where on the south hill?
24    A.  Is it 6th Avenue and Stevens area?
25    Q.  And when you say deliver the policy, would you

Page 19

1  deliver the insurance company (sic) -- pardon me -- the
2  insurance summary, which contains a copy of the
3  insurance policy?
4    A.  The summary along with the policy, correct.
5    Q.  Okay.  And in the last couple of years, do you
6  remember which came first, the delivery of the
7  insurance summary with the policy or the conversation
8  with Stacey over the telephone?
9    A.  The conversations would always come first.
10  There was always an effort made to get together with
11  him.  And when I wasn't able to get together with him,
12  I would -- he would either tell me to drop it off or I
13  would just not have anymore time to get together with
14  him and end up having to drop it off.
15    Q.  Do you remember your conversation with Stacey
16  Lavin concerning the insurance summary and the coverage
17  review for the policy year October 5, 2008, through
18  October 5, 2009?
19    A.  I recall many meetings with him, but nothing
20  specific, no.
21    Q.  And when you had meetings, did you keep notes?
22    A.  I would make notes on the summaries of things
23  that were discussed, yes.
24    Q.  Okay.  And those notes are either coming from
25  the computer or might be actually in the hard file?

Page 20

1    A.  Correct.  Notes were normally just of changes
2  in the policies, that he had decided to change limits
3  or change deductibles or items like that that needed to
4  be changed.
5    Q.  Do you know what this dispute is about between
6  Travelers and Wild Waters and River House?
7    A.  Yes.
8    Q.  It concerns whether or not the vacancy clause
9  of the property and casualty insurance policy applies
10  to deny coverage?
11    A.  Yes.
12    Q.  When did you first become aware of this
13  dispute?
14    A.  I don't recall the exact timeline, but soon
15  after the claim was turned in.
16    Q.  When you became aware of the dispute, did you
17  go back and look at the agency file?
18    A.  No, I did not.
19    Q.  The second page of the Exhibit 2, which is the
20  insurance summary and a copy of the policy, what is
21  this?
22    A.  This is where the coverages are summarized for
23  the limits on the policy, and not all exclusions, but
24  important limitations or exclusions on the policy are
25  listed.

Page 21

1    Q.  Under Coverages -- well, let me ask first,
2  this handwriting on this document, Exhibit 2, is this
3  your handwriting?
4    A.  No.
5    Q.  All right.  Under Coverages, what does it mean
6  when you say "Special Form:  Risks of Direct Physical
7  Loss to Covered Property Unless Cause of Loss
8  Excluded"?
9    A.  Those are the perils insured against.  Special
10  Form is the form that the policy is written under,
11  which is the broadest of the three forms.
12    Q.  And then below that, it is written, "Note:
13  Limitations for vacancy form CPT1080103 Item C5."
14       Do you know why that is included?
15    A.  Because that's a limitation on the insurance
16  policy.
17    Q.  That's the vacancy clause, isn't it?
18    A.  Correct.
19    Q.  Did you have a discussion with Stacey Lavin in
20  September of 2010 or thereabouts concerning the vacancy
21  clause in the casualty insurance policy?
22    A.  I don't recall if I had a discussion in 2010,
23  but there were discussions with him.
24    Q.  When was the first discussion you had?
25    A.  I would guess the first discussion I would

CDA Reporting  Court Reporters
Ph.208-765-3666   Fax:208-676-8903

www.cdareporting.com
888-894-2327
47adbdbd-612d-4451-8b26-746b85a9dfd8

Page 22

1  have had with him was the first year that I had the
2  policy, inherited the policy, about ten years ago.
3      Q.  So about 1992?
4      A.  2002.
5      Q.  Pardon me.  About 2002?
6      A.  Correct.
7      Q.  I can't count.  And about 2002, what
8  discussion did you have -- well, first of all, do you
9  remember a discrete meeting with Stacey Lavin where you
10 discussed the vacancy clause in about 2002?
11     A.  I don't recall that meeting, but I do recall a
12 meeting at his office that I would guess was about six
13 or seven years ago where we had lunch in his office, in
14 his conference room, and had a very long meeting that
15 lasted a few hours where we discussed the ins and outs
16 of the policy, and I do recall discussing that during
17 that meeting.
18     Q.  There is the meeting -- or this meeting
19 happened at Stacey Lavin's office on 6th and Stevens?
20     A.  Correct.
21     Q.  Who else was present when you and Stacey Lavin
22 talked about this?
23     A.  As I recall, it was just him and I.
24     Q.  And was this meeting in around September of
25 that year, six or seven years ago?

Page 23

1      A.  I don't recall what time of the year it was.
2  I don't -- I'm not positive it was even with a renewal.
3  I think it was a get together and talk about
4  insurance --
5      Q.  Do you know --
6      A.  -- midyear.  I'm not positive what year or
7  what time of the year that was.
8      Q.  Do you know who asked for the meeting?
9      A.  No, I do not.
10     Q.  Take me to the discussion about the vacancy
11 clause.  Who said what?
12     A.  He just asked me questions about it.  As I
13 recall, we opened the policy up and looked at it and
14 discussed where he would -- whether he would be vacant
15 or not.  And the consensus at the time was that he was
16 always using it for their business, so he did not feel
17 like it would be vacant, considered vacant, and was not
18 concerned about that vacancy clause.
19     Q.  Well, did he ask for your advice?
20     A.  Yes, he did, and I agreed with him.
21     Q.  So what was your advice?
22     A.  My advice was that we take a look at the cost
23 of a vacant policy, which, as I recall, we gave him an
24 indication from Cochran, but he wasn't interested in
25 pursuing it any further than that.

Page 24

1      Q.  Is this indication from Cochran, would that be
2  in the agency file?
3      A.  That would be a phone discussion that I had
4  with Cochran, and I'm not positive that that's in the
5  file or not.
6      Q.  What were the particulars of the discussion
7  between you and Stacey whether Wild Waters was or would
8  be vacant?
9      A.  All that I can really recall is just
10 discussing the fact that he said that they are always
11 out there using it for their business, whatever that is
12 during the off season, doing maintenance and getting it
13 ready, and during the season running it.
14     Q.  Oh, so was the discussion concerning vacancy
15 whether the vacancy clause would apply to the period
16 after the waterslide season was over in the fall but
17 before the waterslide season started the following
18 spring?
19     A.  Yes.
20     Q.  At that time did you look at the language of
21 the vacancy clause to determine what the customary
22 operations of Wild Waters were?
23     A.  I guess I don't understand that question.  We
24 looked at the policy where it said customary
25 operations.

Page 25

1      Q.  Yeah.  I'll just direct you to chapter and
2  verse here.
3      A.  It's right here.
4      Q.  Right.  This is in this --
5      A.  Um-hmm.
6      Q.  -- assuming that she printed it all.  I don't
7  think she printed it all.
8          MR. LAVIN:  Page 10 was missed.
9          MR. RAMSDEN:  Yeah.  She didn't print it all.
10 So here's what I'm gonna do.  I'm going to substitute
11 for purposes of this deposition the original of the --
12 or the original copy that I have from Wild Waters, LLC,
13 of the insurance summary, including the policy, for --
14 of September 8, 2010, and we'll mark that as the
15 Exhibit 2 if that's okay with you, Mr. Hedberg.
16         MR. HEDBERG:  That's fine.
17         (Exhibit No. 2 was replaced and remarked.)
18 MR. RAMSDEN:
19     Q.  Okay.  That's page 10 of 10 in this insurance
20 form, which is CPT1080103.  And I recognize that the
21 marks on this have not been identified, but I'll
22 represent to you that those are Mr. Lavin's markings,
23 Stacey Lavin.
24         Did you discuss with Stacey Lavin in this
25 conversation the customary operations language that is

7 (Pages 22 to 25)

Tim Warner
May 17, 2013

Travelers Casualty Ins. Co. v. Wild Waters, LLC
Case No. 12-CV-00481-CWD

---

Page 26

1   in paragraph three, "Vacant" means, on page 10 of 10 of
2   form CPT1080103, part of Exhibit 2?
3       A.   When you say paragraph 3, are you -- oh, yes.
4       Q.   Okay.  What did you discuss with Mr. Lavin
5   about what customary operations were?
6       A.   He -- like I said, he said that his customary
7   operations during the off season is to do the
8   maintenance and be ready for opening the next year,
9   which, whether they opened or not, was done the same
10  way, so --
11      Q.   At this meeting six or seven years ago, had
12  Wild Waters opened -- had Wild Waters opened for the
13  season?
14      A.   I'm sorry.  During the what?
15      Q.   At this meeting six or seven years ago at
16  Stacey Lavin's office where you all sit down and have
17  lunch in his conference room, had Wild Waters opened
18  that season?
19      A.   Yes.
20      Q.   How do you know that?
21      A.   Because he told me that it had opened.
22      Q.   Did you ever visit the risk?
23      A.   Yes.
24      Q.   When?
25      A.   I'm sorry?

---

Page 27

1       Q.   When?
2       A.   I was out there on many occasions.  The last
3   one that I recall was about 2008 or 2009, I would
4   guess.
5       Q.   Why were you out at the risk?
6       A.   Just to walk around and look at it and talk to
7   Stacey about it.
8       Q.   Was this during the season when Wild Waters
9   would be open?
10      A.   No, it was in the late spring before they were
11  open.
12      Q.   Did you accompany Stacey on this walk-around?
13      A.   Yes.
14      Q.   What did you look at?
15      A.   The new swing into the water, I'm not sure
16  what it was called, and the lazy river.  And listened
17  to his plans for the future, and he showed me some
18  plans that were drawn up.
19      Q.   At that time was there any discussion of the
20  perils covered, or the limitations or exclusions of
21  coverage under the casualty insurance policy?
22      A.   No.
23      Q.   Returning to Exhibit 2, the second page, which
24  is the summary of the limits and some important
25  limitations on coverage, did you ever have a discussion

---

Page 28

1   with Stacey Lavin about the note that I previously
2   read, "Note:  Limitations for vacancy form"?
3       A.   Yes.
4       Q.   The first conversation -- well, did you have a
5   discussion with Stacey Lavin after September 8th of
6   2010 concerning this note?
7       A.   No.
8       Q.   Did you have a discussion with Stacey Lavin
9   before September 8, 2010, concerning this note?
10      A.   Yes.
11      Q.   When did that conversation happen?
12      A.   I do not recall.
13      Q.   Was it in person or on the telephone?
14      A.   Well, as I said before, we talked about it in
15  the meeting in 2006.  And after that we I'm sure had
16  one or two other meetings face-to-face, and anytime
17  that was reviewed, we would talk about everything on
18  that summary.
19           (Brief pause.  Interruption in conference
20           room.)
21      MR. RAMSDEN:
22      Q.   The date for the insurance coverage review for
23  the liability insurance you said happened annually in
24  June?
25      A.   Prior to the June renewal, yes.

---

Page 29

1       Q.   Prior to the June renewal.  Did you learn in
2   the insurance renewal prior to June of 2010 that Wild
3   Waters was not opening for that season?
4       A.   No.
5       Q.   Was a policy procured and obtained for 2010,
6   June 2010 to June 2011?
7       A.   That's when I found out, when he did not renew
8   the liability insurance.
9       Q.   And did this finding out happen when you were
10  having a telephone conversation with him or a meeting
11  or in some other manner; how did you find out?
12      A.   When he wasn't renewing the policy, we would
13  track him down over the phone.
14      Q.   Did the liability insurance policy
15  automatically renew?
16      A.   No.
17      Q.   It was on -- it was an annual policy, but
18  would require some affirmative effort to have the
19  policy re-procured for each policy period?
20      A.   Correct.
21      Q.   How did you find out for 2010 that Stacey was
22  not going to renew the liability policy for Wild
23  Waters?
24      A.   He just was not responding.
25      Q.   Not responding to what?

---

CDA Reporting Court Reporters
Ph.208-765-3666   Fax:208-676-8903

www.cdareporting.com
888-894-2327
47adbdbd-612d-4451-8b26-746b85a9dfd8

Tim Warner
May 17, 2013

Travelers Casualty Ins. Co. v. Wild Waters, LLC
Case No. 12-CV-00481-CWD

---

Page 30

1    A.  Voicemails, phone calls, e-mails.
2    Q.  Does Moloney + O'Neill keep copies of
3  voicemails?
4    A.  No.
5    Q.  Does Moloney + O'Neill keep transcripts of
6  phone calls?
7    A.  No.
8    Q.  How about notations of phone calls?
9    A.  We try to make notations of phone calls, yes.
10    Q.  And where are the notations of phone calls
11  made?
12    A.  In the computer file.
13    Q.  And does Moloney + O'Neill keep e-mails?
14    A.  Yes.
15    Q.  And where are the e-mails kept?
16    A.  Computer file.
17    Q.  Are they ever transferred to the agency file?
18    A.  Not that I know of.  My understanding is
19  they're all kept on computer files, whether they're
20  backed up on tapes or in the network.
21    Q.  Have you looked at the e-mails that were sent
22  or received from Stacey Lavin concerning the Wild
23  Waters and River House, LLC, risk?
24    A.  No.
25    Q.  Okay.  After these e-mails, phone calls and

Page 31

1  voicemails were not being returned, what did you do to
2  track Mr. Lavin down at or about June of 2010?
3    A.  As I recall, it was not renewed because we
4  were not able to get ahold of him, and I would have to
5  go back and look to see whether it was a phone call
6  from him finally to tell us not to renew it or an
7  e-mail or what it was.
8    Q.  Is one of the places you would look the
9  documents that are here in front of us?
10    A.  I don't think this includes that time frame.
11  This doesn't go back into that time frame, no.  She's
12  working on printing one.
13    Q.  And by "this," what is "this"?
14    A.  That is a summary of the documentation on the
15  computer system.
16    Q.  And this documentation on the computer system
17  goes from September 6th of 2011 until June 29th of
18  2012?
19    A.  Yes, this activity here does, yes.
20    MR. RAMSDEN:  We'll get this marked as
21  Exhibit 3.
22    (Exhibit No. 3 was marked.)
23  MR. RAMSDEN:
24    Q.  The notes in Exhibit 3, as you said, do not
25  cover the period of June of 2010.  Do you remember what

Page 32

1  happened around that time in terms of conversations
2  with Stacey Lavin about whether Wild Waters was going
3  to open for the 2010 season?
4    A.  Not specifically.
5    Q.  Do you remember the substance of it?
6    A.  I don't recall anything specifically, no.
7    Q.  When you found out that Wild Waters was not
8  going to open for the 2010 season, did the coverage
9  available for vandalism and malicious mischief under
10  the Travelers Casualty Insurance policy come into your
11  mind?
12    A.  No.
13    Q.  Did you think that not opening for the 2010
14  season would affect the coverage availability under the
15  property and casualty policy?
16    A.  I didn't think about it.
17    Q.  Did you think that it would be something other
18  than a customary operation for Wild Waters not to open?
19    A.  I didn't think about it.
20    Q.  Is there a reason why you didn't think about
21  it?
22    A.  It just didn't come to my mind at that time.
23    Q.  Did you ever have a conversation with
24  Mr. Lavin before this loss was reported to you about
25  Wild Waters not opening for a season and how that might

Page 33

1  affect the vandalism and malicious mischief coverage
2  under the Travelers property and casualty policy?
3    A.  None that I recall.
4    Q.  Is there a reason why not?
5    A.  As I stated earlier, he was very hard to get
6  ahold of, and I did not talk to him during that time
7  very much at all.  His mainly phone tag at the best.
8    Q.  Well, in the insurance summary for 2010,
9  September 8, 2010, which is Exhibit 2, there's this
10  notation on the limitation of coverage for vacancy.
11  Did anybody at Moloney + O'Neill have a conversation
12  with Stacey Lavin about this note?
13    A.  As I said before, I did have discussions with
14  him about that note.  But not, as I recall, after 2010.
15    Q.  Well, did this note exist before September 8,
16  2010?
17    A.  I think it did, yes.  I would have to get the
18  other summaries to confirm that, but --
19    Q.  There's a file here that's in a jacket.  What
20  is this file?
21    A.  That is what was in the dead file right now.
22    Q.  Okay.  So this is the agency file?
23    A.  Yes.
24    MR. RAMSDEN:  Okay.  I'm going to get this
25  marked as Exhibit 4.

CDA Reporting Court Reporters
Ph.208-765-3666   Fax:208-676-8903

www.cdareporting.com
888-894-2327
47adbdbd-612d-4451-8b26-746b85a9dfd8

Tim Warner
May 17, 2013

Travelers Casualty Ins. Co. v. Wild Waters, LLC
Case No. 12-CV-00481-CWD

---

Page 38

1 liability and vacant building insurance was made to
2 Mr. Lavin in 2010?
3    A. As I recall, we did, but I don't recall how we
4 presented it to him.
5    Q. I see. Did you know that Wild Waters did not
6 open for the 2011 season?
7    A. Yes.
8    Q. How did you know that?
9    A. Because we never wrote a liability policy for
10 him for the functioning park.
11    Q. Well, did there come time in or about June of
12 2011 when Moloney + O'Neill made a presentation to
13 Mr. Lavin in behalf of Wild Waters, LLC, and River
14 House, LLC, for liability insurance?
15    A. For the park functioning, not that I recall.
16    Q. How did you know not to do that?
17    A. Because he never called to request the
18 coverage.
19    Q. And since the -- since no policy had been
20 issued in 2010, or in June of 2010, there would be no
21 policy to renew or otherwise continue; is that what
22 you're saying?
23    A. Correct.
24    Q. And he just never called, so the issue never
25 came up; is that what you're saying?

---

Page 39

1    A. Correct.
2    Q. At the time of this event, or non-event -- at
3 the time of this non-event in or about June of 2011,
4 did you have any concerns about the application of the
5 vandalism and malicious mischief coverage in light of
6 the fact that Wild Waters was not going to open for the
7 2011 season?
8    A. I don't recall having concerns around that
9 time, but I do recall having concerns when he elected
10 not to purchase the coverage.
11    Q. And what were your concerns when he elected
12 not to purchase the coverage?
13    A. That the property was not being used during
14 that time.
15    Q. And how did you communicate with him your
16 concerns?
17    A. I don't recall communicating with him about it
18 other than presenting him a quote.
19    Q. Well, did you tell him why he needed vacant
20 building insurance --
21    A. I don't recall --
22    Q. -- vacant property insurance?
23    A. I don't recall the discussion specifically --
24    Q. So any --
25    A. -- if there was any discussion.

---

Page 40

1    Q. Any or all discussions would, therefore, be in
2 the electronic chron file?
3    A. We try to put them all in there, yes.
4    Q. And if there was no entry in the electronic
5 chron file, there would be no record of the discussion?
6    A. Correct.
7       MR. RAMSDEN: I'm going to have this marked as
8 4B.
9       (Exhibit No. 4B was marked.)
10    MR. RAMSDEN:
11    Q. I'm showing you what's marked as Exhibit 4B,
12 which is part of 4, the agency file. Would you take a
13 look at that?
14       What does Exhibit 4B mean, that handwriting
15 that is on Exhibit 4B?
16    A. It looks like Cathie Hamlin's handwriting, and
17 it looks like she has faxed a copy of the billing
18 statement to Wild Waters, and then notes that this P.O.
19 Box was not working, and has a question as to whether
20 or not there's a change of address.
21    Q. This billing statement is for the October 5,
22 2011, to October 5, 2012, policy period for the
23 Travelers Property and Casualty policy?
24    A. For the 2010 -- or 2011/2012 policy period,
25 yes.

---

Page 41

1    Q. Was this -- was this policy procured and
2 written, to your knowledge?
3    A. This Travelers policy?
4    Q. Yes.
5    A. That's the policy that -- my understanding is
6 that's the one that was in place, yes.
7    Q. There's a policy in place currently for Wild
8 Waters with Travelers?
9    A. I guess I would have to look at this to see
10 why this is a different policy term or different policy
11 number. Oh, no, this is -- this is his insurance
12 policy. And when it cancelled, I do not know, and
13 whether or not it cancelled at this time.
14    Q. At the time of Exhibit 4B?
15    A. That policy automatically renews as long as
16 it's paid.
17    Q. Well, do you know if the coverage -- do you
18 know if the coverages for the October 5, 2011, to
19 October 5, 2012, policy were any different from the
20 coverages for the October 5, 2010, to October 5, 2011,
21 policy?
22    A. Not that I recall.
23    Q. So knowing that vandalism and malicious
24 mischief coverage would not apply to this risk because
25 this property had been vacant for two years, why are

---

11 (Pages 38 to 41)

Tim Warner
May 17, 2013

Travelers Casualty Ins. Co. v. Wild Waters, LLC
Case No. 12-CV-00481-CWD

Page 42

1  you writing this policy?
2      A.  As I recall, I actually had a discussion with
3  Stacey while the claim was going on that he was keeping
4  the policy current because he didn't want to go without
5  coverage because he believed that the form should
6  respond.  And he still did not believe that it was
7  vacant, so he was continuing to keep that policy in
8  force.
9      Q.  And when was it that you had this conversation
10 with Stacey Lavin?
11     A.  It was during one of my conversations with him
12 about the coverages when we were trying to get the
13 claim covered, and I have no specifics on when.
14     Q.  Well, would notes concerning it be contained
15 in the chronology, Exhibit 3?
16     A.  Maybe.
17     Q.  Why don't you take a look at that and see.
18     A.  In this, no -- oh, well -- no, this would have
19 that timeline, so, yes, it might be in here, I guess,
20 if it were in there.
21     Q.  Go ahead and take a look and see if that
22 conversation is recorded.
23     A.  I don't see the conversation in here.
24     Q.  Well, this Exhibit 3 is the chron concerning
25 this account.  It goes from September 6th of 2011 to

Page 43

1  June 29th of 2012.
2      A.  Correct.  So that would mean that there's no
3  documentation of that phone call.
4      Q.  All right.  What do you remember about it?
5      A.  I remember that we were discussing the claim
6  from the -- regarding the adjusters and how to try to
7  get the claim covered.  And he just brought up the fact
8  that he was still keeping that policy in force and felt
9  like if it cancelled, not only would it not be a good
10 thing, but it would send the wrong message to Travelers
11 as far as whether he believed that the vacant -- the
12 property was vacant or not.
13     Q.  Well, by the time of this conversation with
14 Mr. Lavin, had you received a copy of Travelers' letter
15 declining coverage?
16     A.  As I recall, this conversation was after the
17 declinations from Travelers.
18     Q.  After the declinations or declination?
19     A.  Well, declination from Travelers.
20     Q.  Was there one or more than one declination
21 from Travelers?
22     A.  Well, I say declination because we made many
23 efforts to try to get them to cover the claim.
24     MR. RAMSDEN:  Let's get this marked as 5.
25     (Exhibit No. 5 was marked.)

Page 44

1      MR. RAMSDEN:
2      Q.  Okay.  Showing you what's been marked for
3  identification as Exhibit -- or for purposes of this
4  deposition as Exhibit 5, can you tell me what that is?
5      A.  It looks to be a Declination of Coverage from
6  Travelers Insurance to Stacey Lavin and Wild Waters.
7      Q.  Dated January 27, 2012?
8      A.  Yes.
9      Q.  You have a copy of that in your agency file,
10 don't you?
11     A.  If that's what you have in front of you, then
12 yes.
13     Q.  Go ahead and look and verify for yourself that
14 it is what I say it is.
15     A.  Yes.
16     Q.  So this conversation with Stacey Lavin was
17 after you had received the January 27, 2012, letter?
18     A.  Correct.
19     Q.  And this conversation with Stacey Lavin was on
20 the telephone?
21     A.  Yes.
22     Q.  Okay.  Did you at that time offer your opinion
23 whether there was coverage under the Travelers policy?
24     A.  My opinion was that there was coverage under
25 the Travelers policy.

Page 45

1      Q.  Why did you think there was coverage under the
2  Travelers policy?
3      A.  Because as he told me, his -- the park is
4  always -- was always in a position to open with certain
5  maintenance that is done.  So in my opinion, it was
6  being used for the customary operations of Wild Waters.
7      MR. RAMSDEN:  Which one you are you looking
8  for?
9      MR. HEDBERG:  4B.
10     THE WITNESS:  These are all the ones I came in
11 with.
12     (Brief recess was taken.)
13     MR. RAMSDEN:  We're going to go back on the
14 record.
15     Mr. Warner, you've brought me another
16 document, and I'm going to mark this as Exhibit 6.
17     (Exhibit No. 6 was marked.)
18     MR. RAMSDEN:
19     Q.  What is Exhibit 6?
20     A.  This is a computer file going back from
21 January 2012 -- back to -- I'm sorry, yeah,
22 January 2012 back to September of 2008.
23     Q.  And to your knowledge, are there any other
24 computer files concerning the Wild Waters account with
25 Moloney + O'Neill other than Exhibit 3 and Exhibit 6?

12  (Pages 42 to 45)

Tim Warner                                 Travelers Casualty Ins. Co. v. Wild Waters, LLC
May 17, 2013                               Case No. 12-CV-00481-CWD

Page 62

1    Q.  So if somebody broke into Wild Waters and
2    stole stuff, the stuff stolen would not be covered?
3    A.  Correct.
4    Q.  And what's the next line, "Vacancy permit,
5    semicolon, vandalism coverage only"?
6    A.  I would have to read the form to tell you
7    exactly what that is, but my understanding of that
8    would be that it is covering -- saying that there is
9    some coverage for vacancy in the form.  A limited form
10   for vacancy is what that would normally be.
11   Q.  Well, did you, in conjunction with this
12   May 2012 proposal, talk to anyone at Wild Waters about
13   the nature and extent of the proposed coverage?
14   A.  I do not recall having a discussion with them
15   specifically, no.
16   Q.  Did anybody with Moloney + O'Neill?
17   A.  Not that I recall, no.
18   Q.  Was the policy ever bound?
19   A.  No.
20   Q.  Was there a discussion with Stacey Lavin where
21   he said, no, thank you?
22   A.  Not that I recall, no.
23   Q.  I'm looking at Exhibit 6, and I'll hand it to
24   you so you can refer to it.  What happened to the
25   property and casualty insurance policy issued by

Page 63

1    Travelers for the October 5th, 2011, to October
2    the 5th, 2012, policy term?
3    A.  The 2011 to 2012 term?
4    Q.  Yes.
5    A.  I don't see any documentation that says
6    anything specifically.
7    Q.  Well, did you receive a notice from Travelers
8    that the policy was cancelled?
9    A.  Actually, I see here where a renewal policy
10   was offered and we mailed out the renewal on 9/6.
11   Q.  Of which year?
12   A.  Of 2011.  So it looks like it renewed 2006 --
13   or I'm sorry, 10 of 2011.
14   Q.  And was the policy cancelled short of its
15   expiration on October 5th, 2012?
16   A.  Cancelled effective 5/20/2012 due to vacancy.
17   Q.  And the second page of your agency file has a
18   notice of cancellation effective May 20, 2012, right?
19   A.  Correct.
20   Q.  Did you have any discussions with anyone at
21   Travelers other than Mat Knifton --
22   A.  Yes.
23   Q.  -- about this?  Who else did you talk to?
24   A.  Mark Franken.
25   Q.  Who did you understand Mr. Franken to be?

Page 64

1    A.  I called Mary Townsend, who was our liaison
2    marketing rep with Travelers, to ask her who might be
3    able to help me get this claim covered.  And she gave
4    me the name of Mark Franken as upper management, so I
5    called Mark Franken to discuss the claim with him.
6        And as I recall, when I discussed it with him,
7    his initial response to my -- my interpretation of the
8    claim and what he was able to see while on his computer
9    while he was talking to me was that it looked like it
10   should be a valid claim, but he would have to dig into
11   it farther and talk to the people involved in
12   Sacramento.  He was in Portland.  And that was the gist
13   of the conversation with him.
14   Q.  Did you have any other conversation with Mat
15   Knifton -- or pardon me, Mark Franken?
16   A.  No.
17   Q.  What was the date of that conversation with
18   Mark Franken?
19   A.  I do not have that date, and I looked in the
20   file and I don't have documentation of that either.
21   Q.  It's not in the chron, either Exhibit 3 or
22   Exhibit 6?
23   A.  No.
24   Q.  Were you advised of Travelers' decision on
25   reconsideration of the claim?

Page 65

1    A.  Was I advised by --
2    Q.  Anybody in the world of --
3    A.  No.
4    Q.  -- a decision on Travelers' reconsideration of
5    the claim?
6    A.  When I discussed it with them, they said they
7    would consider my arguments, but nothing more formal
8    than that that I recall.
9    Q.  And what were your arguments?
10   A.  That the property was being used for the Wild
11   Waters in their customary -- their wording of customary
12   operations of Wild Waters.
13   Q.  Anything other than that that you told them?
14   A.  Not that I recall.  Just arguing that point.
15   Q.  Well, did you say something about having the
16   property ready to operate was a customary operation?
17   A.  Yes.
18   Q.  And that the property might not operate for a
19   season due to bad weather and that was still a
20   customary operation?
21   A.  I didn't have that specific conversation, but
22   the conversation was that it was customary for them to
23   be not -- to not be open, and may be open at different
24   dates during the year.  And that their plan, according
25   to Stacey, was that they wanted to open -- he wanted to

17 (Pages 62 to 65)

Tim Warner
May 17, 2013

Travelers Casualty Ins. Co. v. Wild Waters, LLC
Case No. 12-CV-00481-CWD

### Page 66

1  open every year, whether they opened or not. And that
2  Stacey felt like the property with short notice could
3  be opened because everything was in place other than
4  some maintenance to open.
5     Q.  And after you had this conversation and made
6  this proposal, did you receive any word of Travelers'
7  decision on reconsideration?
8     A.  Just final declination.
9     Q.  And when did you receive the final
10 declination?
11    A.  I don't see a copy of it in the file.
12    Q.  Do you have a notation in the chronology of
13 the final declination?
14    A.  I don't.
15       (Exhibit No. 8 was marked.)
16 MR. RAMSDEN:
17    Q.  Okay.  I'm handing you what's been marked as
18 Exhibit 8.  Would you look at that and tell me if
19 you've seen it before?
20    A.  Yes, I have.
21    Q.  What is it?
22    A.  It is a Declination of Coverage, dated May 17,
23 2012, from Travelers.
24    Q.  Do you know why it's not in
25 Moloney + O'Neill's file?

### Page 67

1     A.  I do not.
2     Q.  Do you know when Moloney + O'Neill would have
3  received it?
4     A.  I do not.
5     Q.  When did Moloney + O'Neill close its file on
6  Wild Waters?
7     A.  It was set up as inactive on 6/29/2012.
8     Q.  So this letter was -- bears a date of May 17,
9  2012, before the file was closed.
10    A.  Correct.
11    Q.  So why isn't the letter in your file?
12    A.  I do not know.
13    Q.  Is there anybody at Moloney + O'Neill who does
14 know?
15    A.  There may be, yes.
16    Q.  Who would that be?
17    A.  Deedee.
18    Q.  Who is Deedee?
19    A.  Our agency manager, CSR manager.
20    Q.  What is CSR manager?  What does CSR mean?
21    A.  Customer Service Representative Manager.
22    Q.  Why would she know whether -- why would she
23 know about what happened to this letter?
24    A.  Because she takes care of what we do with all
25 the documentation.  And if I'm not seeing it in the

### Page 68

1  system, she would be able to find it if it's in there.
2       MR. RAMSDEN:  Let me take a few minutes here
3  just to review this, and I think I'm done unless my
4  learned friends have questions they want me to ask.  So
5  we'll take a break.
6       (Brief recess was taken.)
7       MR. RAMSDEN:  All right.  We're back on.
8  MR. RAMSDEN:
9     Q.  Did you have a chance to talk to Deedee about
10 Exhibit 8, the May 17, 2012 --
11    A.  Yes.
12    Q.  -- letter?
13    A.  Yes.
14    Q.  What did you find out?
15    A.  It's not attached.
16    Q.  Not attached to what?
17    A.  The computer file.  It's not attached to any
18 computer file.
19    Q.  So do you know if Moloney + O'Neill actually
20 got this letter?
21    A.  I cannot say that, I guess, one way or the
22 other.
23    Q.  Because the CC provision says to Moloney,
24 O'Neill, Corkery & Jones.
25    A.  I know that I eventually got a copy of it

### Page 69

1  because I recall reading it, yes.
2     Q.  Do you recall whom you got it from?
3     A.  No, I don't.
4     Q.  Could it have been Stacey?
5     A.  It could have been Stacey.
6     Q.  When you were talking to Mark Franken on the
7  telephone, did Mark Franken give you every impression
8  that the insurance claim would be paid?
9     A.  When I hung up the phone with him, I felt very
10 good about it, yes, that it would be paid.
11    Q.  And did you report that to Stacey?
12    A.  Yes, I did, that I felt that I had somebody in
13 upper management on our side that seemed to, with the
14 initial discussion with him, agree with me and him
15 regarding the claim.
16    Q.  Do you know why the declination letter wasn't
17 received by you until March 21st of 2012 if the loss
18 was as early as September 1st of 2011?
19    A.  Well, why they would not decline it until
20 January when the claim was in September I felt was a
21 long time.  But then I have no idea why, if they sent
22 the letter in January, why we didn't receive it until
23 somebody sent us a copy in March, no.
24    Q.  Did you do anything to determine what the
25 value of the improvements at Wild Waters was in order

CDA Reporting Court Reporters
Ph.208-765-3666   Fax:208-676-8903

www.cdareporting.com
888-894-2327

47adbdbd-612d-4451-8b26-746b85a9dfd8



Insurance Summary

For

# Wild Waters, LLC.
# River House, LLC.
### PO Box 1091
### Spokane, Wa.  99210

Presented by:

**MOLONEY + O'NEILL**
818 W. Riverside #800
Spokane, WA  99201
Phone: (509) 325-3024
Fax: (509) 325-1803

Tim Warner
Account Executive
509-343-9249 (direct)

Cathie Hamlin
Account Manager
509-343-9224(direct)

September 8, 2010



EXHIBIT   2
WIT: T. Warner
DATE: 5|17|13
Anita Self, CSR, RPR

moloney+oneill
insurance benefits financial life

# WILD WATERS, LLC.

| | | |
|---|---|---|
| **Company** | : | Travelers Property Casualty Co of America |
| **Policy #** | : | I6606179M836TIL10 |
| **Policy Term** | : | 10-5-10 to 10-5-11 |

## PROPERTY

**Covered Location:**     2119 Government Way  Coeur d'Alene, ID

| | |
|---|---|
| $ 226,600 | Building – Main Building |
| 79,310 | Personal Property |
| 20,600 | Building - Pump House |
| 30,900 | Personal Property – Pump House |
| 25,750 | Picnic Canopy |
| 10,300 | Restaurant/Bar Personal Property |

*393460*

**Coverages:**
- Special Form:  *Risks of Direct Physical Loss to Covered*
                 *Property Unless Cause of Loss Excluded*
***Note:  Limitations for vacancy form CPT1080103 Item C5***
- 80% Co-insurance
- $2,500 Deductible
- Actual Cash Value Buildings
- Replacement Cost Personal Property

*393,460*
*75,000*
*468,460*
*extended coverage*

**TOTAL ANNUAL PREMIUM:  $1,996**

**Direct Billing Plan with Company**

*$470,000*

818 West Riverside Ste. 800  Spokane, WA 99201    p 509.325.3024  f 509.325.1803    moloneyoneill.com

forward thinking

moloney+o'neill
insurance. benefits  financial  life

# SPECIAL NOTE

This summary of insurance coverages provides only a source of reference to the insurance coverages and limits provided by your policy itself.  No coverage is provided by this summary, nor can it be construed to replace any provision in your policy.  Please read and review your policy for complete information on the coverages you are provided.  If there is any conflict between the policy and this summary, the provisions of the policy shall prevail.

As your insurance broker, we do not provide legal or tax-related advice.  Please consult with your attorney or accountant for professional advice as needed.

# COVERAGE CHECKLIST



**Some other coverages you may want to consider if not already purchased are:**

- ➢ Business Income
- ➢ Extra Expense
- ➢ Accounts Receivable
- ➢ Valuable Papers
- ➢ Theft of Money
- ➢ Employee Dishonesty
- ➢ Mechanical Breakdown (Boiler & Machinery)
- ➢ Spoilage/Refrigeration Breakdown
- ➢ Computer Breakdown
- ➢ Employee Tools
- ➢ Signs
- ➢ Property Off Premises
- ➢ Property in Transit
- ➢ Property of Others (Clients, Employees, Other)
- ➢ Building Ordinance
- ➢ Tenant Improvements & Betterments
- ➢ Mold

- ➢ Agreed Value
- ➢ Flood & Earthquake
- ➢ Aggregate per Project or Location
- ➢ Fire or Tenants Legal Liability
- ➢ Errors & Omissions/Professional Liability
- ➢ Employee Benefits Liability
- ➢ Fiduciary Liability
- ➢ Directors & Officers Liability
- ➢ Pollution Liability
- ➢ Food Borne Illness Liability
- ➢ Employment Practices Liability
- ➢ Workers Compensation
- ➢ Employers Liability/Stop Gap
- ➢ Non-Owned & Hired Auto Liability
- ➢ Hired Auto Physical Damage
- ➢ Higher Liability Limits (Umbrella)

**This is only a brief summary of available coverages. Your own situation may require other coverages not included in this list. Please contact your agent for a quote.**



# CHANGES AND DEVELOPMENTS

It is important that we be advised of any changes in your operations that may have a bearing on the validity and/or adequacy of your insurance. Please let us know what changes are necessary in your insurance program in order to properly treat these exposures. The types of changes that concern us include, but are not limited to, those listed below:

1.   Changes in any operations such as an expansion to another state, new products or new applications of existing products.

2.   Mergers and/or acquisition of new companies.

3.   Any newly assumed contractual liability, granting of indemnities or hold harmless agreements. Your obligations under signed contracts may be broader than your insurance coverage.

4.   Circumstances that may require an increased liability insurance limit.

5.   Any changes in fire or theft protection such as the installation of or disconnection of sprinkler systems, burglar alarms, etc. This includes any alterations to the same.

6.   Immediate advise of any changes to scheduled equipment such as vehicles, contractor's equipment, electronic date processing equipment, etc.

7.   Property of yours that is in transit, unless we have arranged for insurance previously.

8.   Any changes in existing premises including increase in property values, vacancy, whether temporary or permanent, alterations, demolition, etc. Also any new premises either purchased, constructed or occupied.

Your insurance program will only be as good as the communications maintained between you and your insurance agent.



# MINIMUM EARNED PREMIUM
# MINIMUM AND DEPOSIT PREMIUM

The following terms are often misunderstood among insureds not accustomed to dealing with surplus lines insurance companies. It is important that the definitions are understood.

## MINIMUM AND DEPOSIT

This is the amount of premium due at inception. Although the policy is subject to adjustment based on a rate per exposure unit, under no circumstances will the annual earned premium be less than the minimum premium. Therefore, the policy may generate an additional premium on audit, but not a return.

If such a policy is cancelled mid-term, the earned premium is the GREATER of the annual minimum times the short rate or pro-rata factor, or the actual earned as determined by the audit, subject to a short rate penalty if applicable.

## MINIMUM EARNED PREMIUM

A minimum earned premium endorsement can be attached to either a flat charge policy or an adjustable policy. In either case, this amount is the LEAST that will be retained by the insurance company once the policy goes into effect. The amount retained would be the GREATER of the actual earned premium whether calculated on a pro-rate or short rate basis, or the minimum earned premium.

## FLAT CANCELLATIONS

Surplus lines insurance companies normally do not allow flat cancellations. Once the policy is in effect, some premium will be earned.

If you need further explanation, please do not hesitate to contact us.

 **TRAVELERS**

One Tower Square, Hartford, Connecticut  06183

```
                            TRAVELERS CORP. TEL: 1-800-328-2189
                            SPECIAL BUSINESS
                            COMMON POLICY DECLARATIONS
                            ISSUE DATE: 08/18/10
                            POLICY NUMBER: I-660-6179M836-TIL-10
INSURING COMPANY:
TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA

1. NAMED INSURED AND MAILING ADDRESS:
   WILD WATERS LLC
   RIVER HOUSE LLC
   P.O. BOX 2439
   COEUR D' ALENE, ID 83814


2. POLICY PERIOD:  From 10/05/10 to 10/05/11 12:01 A.M. Standard Time at
                                                your mailing address.

3. LOCATIONS
        Premises  Bldg.
        Loc. No.  No.  Occupancy           Address

        SEE IL TO 03



4. COVERAGE PARTS FORMING PART OF THIS POLICY AND INSURING COMPANIES:
   COMMERCIAL PROPERTY COV PART DECLARATIONS          CP TO 11 01 03 TIL






5. NUMBERS OF FORMS AND ENDORSEMENTS
   FORMING A PART OF THIS POLICY:   SEE IL T8 01 10 93

6. SUPPLEMENTAL POLICIES: Each of the following is a separate policy
                          containing its complete provisions:
   Policy                         Policy No.          Insuring Company



     DIRECT BILL
7. PREMIUM SUMMARY:
     Provisional Premium   $ 1,996
     Due at Inception      $
     Due at Each           $

NAME AND ADDRESS OF AGENT OR BROKER:          COUNTERSIGNED BY:
   MOLONEY O NEILL C & J (F7048)
   818 WEST RIVERSIDE  #800
   SPOKANE, WA 99201                          Authorized Representative

                                             DATE:


IL TO 02 11 89(REV. 09-07)    PAGE 1 OF 1
OFFICE: SEATTLE
```

002526



**TRAVELERS**

To Our Valued Customer,

Each year, homeowners and business owners across the nation sustain significant weather-related property damage due to floods. These can include losses caused by waves, tidal waters, the overflow of a body of water, the rapid accumulation or runoff of surface water, and mudslide. In nearly all cases, these flood losses cannot be prevented or even anticipated. And, in many instances, the losses are devastating.

Most standard property insurance policies, including most of our policies, do <u>not</u> provide coverage for flood losses. While flood coverage is often available – primarily through the <u>National Flood Insurance Program</u> – it is rarely purchased. Unfortunately, each year we find that some policyholders are surprised and disappointed to learn that damages they have suffered as a direct result of flood are not covered under the policies they have purchased.



Please review your insurance coverage with your agent or Company representative. As you consider the need for flood insurance, keep in mind that floods can, and do, occur in locations all over the country. They are not limited to coastal areas or locations with nearby rivers or streams. Several inches of rain falling over a short period of time can cause flood damage, even in normally dry areas that are not prone to flooding.

Your agent or Company representative can help you assess your risk. They can provide you with information on flood insurance available through us, including our "Write Your – Own-Flood" program, which enables agents to write flood insurance through the <u>National Flood Insurance Program</u>. Your agent or Company representative can help you assess your risk.

PN T0 53 04 07

Page 1 of 1

002563



**TRAVELERS**

**Report Claims Immediately by Calling\***
**1-800-238-6225**
*Speak directly with a claim professional*
*24 hours a day, 365 days a year*

\*Unless Your Policy Requires **Written** Notice or Reporting

## COMMERCIAL INSURANCE

**A Custom Insurance Policy Prepared for:**

WILD WATERS LLC
RIVER HOUSE LLC
P.O. BOX 2439
COEUR D' ALENE ID 83814



Presented by:  MOLONEY O NEILL C & J


**TRAVELERS**

POLICY NUMBER: I-660-6179M836-TIL-10

EFFECTIVE DATE: 10-05-10

ISSUE DATE: 08-18-10

LISTING OF FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS

THIS LISTING SHOWS THE NUMBER OF FORMS, SCHEDULES AND ENDORSEMENTS
BY LINE OF BUSINESS.

```
IL TO 02 11 89    COMMON POLICY DECLARATIONS
IL T8 01 10 93    FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS
IL TO 01 01 07    COMMON POLICY CONDITIONS
IL TO 03 04 96    LOCATION SCHEDULE
```

COMMERCIAL PROPERTY

```
CP TO 11 01 03    COMMERCIAL PROPERTY DECLARATIONS
CP TO 05 04 94    MORTGAGEE SCHEDULE
CP TO 00 01 03    TABLE OF CONTENTS
CP 00 90 07 88    COMMERCIAL PROPERTY CONDITIONS
CP T1 00 01 03    BUILDING & PERSONAL PROPERTY COV FORM
CP T1 08 01 03    CAUSES OF LOSS-SPECIAL FORM
CP T3 81 01 08    TERRORISM RISK INS ACT 2002 DISCLOSURE
```

INTERLINE ENDORSEMENTS

```
IL T3 82 08 06    EXCL OF LOSS DUE TO VIRUS OR BACTERIA
IL T3 79 01 08    CAPS ON LOSSES FROM CERT ACTS OF TERROR
IL 02 04 09 08    IDAHO CHANGES-CANCELLATION/NONRENEWAL
IL T3 55 08 98    EXCL OF CERTAIN COMPUTER REL LOSSES
```



**IL T8 01 10 93**

PAGE: 1 OF 1

002527

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions:

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy or any Coverage Part by mailing or delivering to the first Named Insured written notice of cancellation at least:

    a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

    b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. If the policy is cancelled, that date will become the end of the policy period. If a Coverage Part is cancelled, that date will become the end of the policy period as respects that Coverage Part only.

5. If this policy or any Coverage Part is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us as part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

    a. Make inspections and surveys at any time;

    b. Give you reports on the conditions we find; and

    c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

    a. Are safe or healthful; or

    b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

1. The first Named Insured shown in the Declarations:

    a. Is responsible for the payment of all premiums; and

    b. Will be the payee for any return premiums we pay.

2. We compute all premiums for this policy in accordance with our rules, rates, rating plans, premiums and minimum premiums. The premium shown in the Declarations was computed based on rates and rules in effect at



002528

the time the policy was issued. On each re-newal continuation or anniversary of the ef-fective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named in-sured.

If you die, your rights and duties will be trans-ferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary cus-tody of your property will have your rights and duties but only with respect to that property.

**G. Equipment Breakdown Equivalent to Boiler and Machinery**

On the Common Policy Declarations, the term Equipment Breakdown is understood to mean and include Boiler and Machinery and the term Boiler and Machinery is understood to mean and include Equipment Breakdown.

This policy consists of the Common Policy Declarations and the Coverage Parts and endorsements listed in that declarations form.

In return for payment of the premium, we agree with the Named Insured to provide the insurance afforded by a Coverage Part forming part of this policy. That insurance will be provided by the company indicated as insuring company in the Common Policy Declarations by the abbreviation of its name opposite that Coverage Part.

One of the companies listed below (each a stock company) has executed this policy, and this policy is counter-signed by the officers listed below:

The Travelers Indemnity Company (IND)

The Phoenix Insurance Company (PHX)

The Charter Oak Fire Insurance Company (COF)

Travelers Property Casualty Company of America (TIL)

The Travelers Indemnity Company of Connecticut (TCT)

The Travelers Indemnity Company of America (TIA)

Travelers Casualty Insurance Company of America (ACJ)

Secretary

President

**LOCATION SCHEDULE**               **POLICY NUMBER:** I-660-6179M836-TIL-10

This Schedule of Locations and Buildings applies to the Common Policy Declarations for the period
10-05-10 to 10-05-11 .

| Loc. No. | Bldg. No. | Address | Occupancy |
|---|---|---|---|
| 1 | 1 | 2119 N GOVERNMENT WAY<br>COEUR D'ALENE, ID 83814 | KITCHEN AND OFFICE |
| 1 | 2 | 2119 N GOVERNMENT WAY<br>COEUR D'ALENE, ID 83814 | PUMP HOUSE |
| 1 | 3 | 2119 N GOVERNMENT WAY<br>COEUR D'ALENE, ID 83814 | PICNIC CANOPY |
| 1 | 4 | 2119 N GOVERNMENT WAY<br>COEUR D'ALENE, ID 83814 | RESTAURANT/BAR |



IL T0 03 04 96                              Page    1  (END)

# COMMERCIAL PROPERTY

# COMMERCIAL PROPERTY



# TRAVELERS

One Tower Square, Hartford, Connecticut 06183

**COMMERCIAL PROPERTY**
**COVERAGE PART DECLARATIONS**

**POLICY NUMBER:** I-660-6179M836-TIL-10
**ISSUE DATE:** 08-18-10

INSURING COMPANY:
TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA

DECLARATIONS PERIOD: From 10/05/10 to 10/05/11 12:01 A.M. Standard Time at your
mailing address shown in the Common Policy Declarations.

The Commercial Property Coverage Part consists of these Declarations and the
attached Supplemental Declaration(s), Schedule(s), Table of Contents, Commercial
Property Conditions, the Coverage Form(s), the Cause of Loss Form(s) and
endorsements.

1. COVERAGE - Insurance applies only to premises location(s) and building number(s)
   shown below for the coverage(s), optional coverage(s) or coverage option(s)
   indicated in this Declarations or specified in any endorsements attached to this
   Coverage Part.

2. DEDUCTIBLE - The following deductible applies unless a different or more
   specific deductible is indicated within this Declarations or by endorsement.

   $   2,500 per occurrence

PREMISES LOCATION NO. 0001     BUILDING NO. 0001

| COVERAGE | | LIMIT OF INSURANCE | COINSURANCE | CAUSES OF LOSS |
|---|---|---|---|---|
| Building | $ | 226,600 | 80% | Special |
| Your Business Personal Property Replacement Cost applies | $ | 79,310 | 80% | Special |

PREMISES LOCATION NO. 0001     BUILDING NO. 0002

| COVERAGE | | LIMIT OF INSURANCE | COINSURANCE | CAUSES OF LOSS |
|---|---|---|---|---|
| Building | $ | 20,600 | 80% | Special |
| Your Business Personal Property Replacement Cost applies | $ | 30,900 | 80% | Special |

PREMISES LOCATION NO. 0001     BUILDING NO. 0003

| COVERAGE | | LIMIT OF INSURANCE | COINSURANCE | CAUSES OF LOSS |
|---|---|---|---|---|
| Building | $ | 25,750 | 80% | Special |

CP T0 11 01 03



**TRAVELERS**

One Tower Square, Hartford, Connecticut 06183

**COMMERCIAL PROPERTY**
**COVERAGE PART DECLARATIONS**

**POLICY NUMBER:** I-660-6179M836-TIL-10
**ISSUE DATE:** 08-18-10

PREMISES LOCATION NO. 0001     BUILDING NO. 0004

| COVERAGE | LIMIT OF INSURANCE | COINSURANCE | CAUSES OF LOSS |
|---|---|---|---|
| Your Business Personal Property Replacement Cost applies | $     10,300 | 80% | Special |

CP T0 11 01 03

 **TRAVELERS**

One Tower Square, Hartford, Connecticut 06183

**COMMERCIAL PROPERTY**
**COVERAGE PART DECLARATIONS**

**POLICY NUMBER:** I-660-6179M836-TIL-10
**ISSUE DATE:** 08-18-10

SUPPLEMENTAL DECLARATIONS

ADDITIONAL COVERAGES & COVERAGE EXTENSIONS

The following Additional Coverages and Coverage Extensions are provided under the Coverage Form(s) listed below for the Limits of Insurance shown. These Limits of Insurance apply in any one occurrence unless otherwise stated.

Some of these Additional Coverages and Coverage Extensions, or the applicable Limits of Insurance, may be modified by endorsements attached to this policy. There may also be other Additional Coverages or Coverage Extensions within your policy. Please read it carefully.

BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Additional Coverages 

Limit of Insurance

| | | |
|---|---|---|
| Debris Removal | | |
| - Additional Amount at each described premises | $ | 25,000 |
| Pollutant Cleanup and Removal | | |
| - 12 Month Aggregate Limit | $ | 25,000 |
| Preservation of Property | | Policy Limit |
| Fire Department Service Charge | $ | 5,000 |
| Reward Coverage | | |
| - Maximum Limit | $ | 5,000 |
| Increased Cost of Construction | | |
| - At each described premises | $ | 10,000 |
| Fire Protective Equipment Discharge | $ | 5,000 |

Coverage Extensions

| | | |
|---|---|---|
| Newly Acquired or Constructed Property | | |
| - Each Building | $ | 500,000 |
| - Personal Property in total, at each premises | $ | 250,000 |
| Personal Effects and Property of Others | | |
| - At each described premises | $ | 10,000 |
| - Any one employee | $ | 2,500 |
| Valuable Papers and Records | | |
| - At each described premises | $ | 10,000 |
| Property Off-Premises | | |
| - At any installation premises or temporary storage premises while awaiting installation | $ | 10,000 |
| - At any other premises you do not own, lease, or regularly operate including fairs, trade shows and "exhibitions" | $ | 25,000 |
| Temporary Relocation of Property | $ | 50,000 |
| Outdoor Property | $ | 10,000 |
| - Any one tree, shrub or plant | $ | 500 |
| - Any one antenna | $ | 2,500 |
| Claim Data Expense | $ | 2,500 |

CP T0 11 01 03



One Tower Square, Hartford, Connecticut  06183

**COMMERCIAL PROPERTY**
**COVERAGE PART DECLARATIONS**

**POLICY NUMBER:** I-660-6179M836-TIL-10
**ISSUE DATE:** 08-18-10

BUILDING AND PERSONAL PROPERTY COVERAGE FORM (continued)

| Coverage Extensions | | Limit of Insurance |
|---|---|---|
| Extra Expense (including Expediting Expenses) | $ | 2,500 |
| Accounts Receivable | | |
|   - At each described premises | $ | 10,000 |
| Non-Owned Detached Trailers | $ | 5,000 |
| Outside Signs | $ | 2,500 |
| Covered Property in Transit | $ | 10,000 |
| Duplicate Electronic Data Processing Data & Media | $ | 10,000 |
| Electronic Data Processing Equipment and Data & Media - Limited | $ | 10,000 |
| Theft Damage to Rented Property | | Policy Limit |

CP T0 11 01 03

PRODUCER: MOLONEY O NEILL C & J          F7048          OFFICE: SEATTLE          199

 **TRAVELERS**

One Tower Square, Hartford, Connecticut 06183

**COMMERCIAL PROPERTY
COVERAGE PART DECLARATIONS**

**POLICY NUMBER:** I-660-6179M836-TIL-10
**ISSUE DATE:**

| Premises Loc. No. | Bldg. No. | Mortgage Holder Name and Mailing Address |
|---|---|---|
| 1 | 1 | WASHINGTON TRUST BANK LOAN #397250-4260 PO BOX 2127 SPOKANE                WA 99210 |
| 1 | 2 | WASHINGTON TRUST BANK LOAN #397250-4260 PO BOX 2127 SPOKANE                WA 99210 |
| 1 | 3 | WASHINGTON TRUST BANK LOAN #397250-4260 PO BOX 2127 SPOKANE                WA 99210 |

002533 CP T0 05 04 94

COMMERCIAL PROPERTY

## TABLE OF CONTENTS

# COMMERCIAL PROPERTY COVERAGE PART

**The following indicates the contents of the principal Forms which may be attached to your policy. It contains no reference to the Declarations or Endorsements which also may be attached.**

Page No. Varies By Form

COMMERCIAL PROPERTY CONDITIONS
- A. Concealment, Misrepresentation or Fraud
- B. Control of Property
- C. Insurance Under Two or More Coverages
- D. Legal Action Against Us
- E. Liberalization
- F. No Benefit to Bailee
- G. Other Insurance
- H. Policy Period, Coverage Territory
- I. Transfer of Rights of Recovery Against Others to Us

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
- A. Coverage
- B. Exclusions and Limitations
- C. Limits of Insurance
- D. Deductible
- E. Loss Conditions
- F. Additional Conditions
- G. Optional Coverages
- H. Definitions

CAUSES OF LOSS–BASIC FORM
- A. Covered Causes of Loss
- B. Exclusions
- C. Limitations
- D. Definitions

CAUSES OF LOSS–BROAD FORM
- A. Covered Causes of Loss
- B. Exclusions
- C. Limitations
- D. Additional Coverage–Collapse
- E. Definitions

CAUSES OF LOSS–SPECIAL FORM
- A. Covered Causes of Loss
- B. Exclusions
- C. Limitations
- D. Additional Coverage–Collapse
- E. Additional Coverage Extensions
- F. Definitions

BUSINESS INCOME COVERAGE FORM
- A. Coverage
- B. Covered Causes of Loss, Exclusions and Limitations
- C. Limits of Insurance
- D. Loss Conditions
- E. Additional Condition
- F. Optional Coverages
- G. Definitions

BUILDERS' RISK COVERAGE FORM
- A. Coverage
- B. Exclusions and Limitations
- C. Limits of Insurance
- D. Deductible
- E. Loss Conditions
- F. Additional Conditions
- G. Definition

CONDOMINIUM ASSOCIATION COVERAGE FORM
- A. Coverage
- B. Exclusions and Limitations
- C. Limits of Insurance
- D. Deductible
- E. Loss Conditions
- F. Additional Conditions
- G. Optional Coverages
- H. Definition

CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
- A. Coverage
- B. Exclusions and Limitations
- C. Limits of Insurance
- D. Deductible
- E. Loss Conditions
- F. Additional Condition
- G. Optional Coverages
- H. Definitions

EXTRA EXPENSE COVERAGE FORM
- A. Coverage
- B. Covered Causes of Loss, Exclusions and Limitations
- C. Limits of Insurance
- D. Loss Conditions
- E. Definitions



COMMERCIAL PROPERTY

---

**TABLE OF CONTENTS (Cont'd)**

Page No. Varies By Form

LEGAL LIABILITY COVERAGE FORM
- A. Coverage
- B. Exclusions
- C. Limits of Insurance
- D. Loss Conditions
- E. Additional Conditions
- F. Definition

MORTGAGE HOLDER'S ERRORS AND OMISSIONS
COVERAGE FORM
- A. Coverage
- B. Exclusions
- C. Limits of Insurance
- D Additional Coverage–Collapse
- E. Condition Applicable to Coverage
  A–Mortgage Holder's Interest
- F. Conditions Applicable to Coverage
  B–Property Owned or Held in Trust
- G. Conditions Applicable to Coverage
  C–Mortgagee Holders Liability
  and Coverage D–Real Estate Tax
  Liability
- H. Conditions Applicable to All Coverages
- I. Definitions

LEASEHOLD INTEREST COVERAGE FORM
- A. Coverage
- B. Exclusions
- C. Limits of Insurance
- D. Loss Conditions
- E. Additional Condition
- F. Definitions

TOBACCO SALES WAREHOUSES COVERAGE
FORM
- A. Coverage
- B. Exclusions
- C. Limits of Insurance
- D. Deductible
- E. Loss Conditions
- F. Additional Conditions
- G. Definitions

---

CP T0 00 01 03

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

## A. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This Coverage Part;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this Coverage Part.

## B. CONTROL OF PROPERTY

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

## C. INSURANCE UNDER TWO OR MORE COVERAGES

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

## D. LEGAL ACTION AGAINST US

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all of the terms of this Coverage Part; and
2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

## E. LIBERALIZATION

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

## F. NO BENEFIT TO BAILEE

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

## G. OTHER INSURANCE

1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

## H. POLICY PERIOD, COVERAGE TERRITORY

Under this Coverage Part:

1. We cover loss or damage commencing:
   a. During the policy period shown in the Declarations; and
   b. Within the coverage territory.

2. The coverage territory is:
   a. The United States of America (including its territories and possessions);
   b. Puerto Rico; and
   c. Canada.

## I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But



Copyright, ISO Commercial Risk Services, Inc. 1983, 1987

002535

COMMERCIAL PROPERTY

you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property or Covered Income.

2. After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

a. Someone insured by this insurance;

b. A business firm:

   (1) Owned or controlled by you; or

   (2) That owns or controls you; or

c. Your tenant.

This will not restrict your insurance.

Copyright, ISO Commercial Risk Services, Inc. 1983, 1987

CP 00 90 07 88

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout the policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION H – DEFINITIONS.**

## A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss.

1. **Covered Property**

   Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.**, and limited in **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

   a. **Building,** meaning the building or structure described in the Declarations, including:

      (1) Completed additions;

      (2) Fixtures, including outdoor fixtures;

      (3) Machinery and equipment permanently attached to the building or structure;

      (4) Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

         (a) Fire extinguishing equipment;

         (b) Outdoor furniture;

         (c) Floor coverings;

         (d) Lobby and hallway furnishings owned by you;

         (e) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering (not used for restaurant operations);

         (f) Lawn maintenance and snow removal equipment; and

         (g) Alarm systems;

      (5) If not covered by other insurance:

         (a) Alterations and repairs to the building or structure; and

         (b) Materials, equipment, supplies and temporary structures, on or within 1,000 feet of the described premises, used for making alterations or repairs to the building or structure.

   b. **Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 1,000 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property–Separation of Coverage endorsement:

      (1) Furniture and fixtures;

      (2) Machinery and equipment;

      (3) "Stock";

      (4) All other personal property owned by you and used in your business;

      (5) Labor, materials or services furnished or arranged by you on personal property of others;

      (6) Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

         (a) Made a part of the building or structure you occupy or lease, but do not own; and

         (b) You acquired or made at your expense but are not permitted to remove;

(7) Leased personal property for which you have a contractual responsibility to insure, unless coverage is otherwise provided for under Personal Property of Others.

Your Business Personal Property does not include "Electronic Data Processing Equipment" or "Electronic Data Processing Data and Media" except as provided under Sections **A.1.d.** "Electronic Data Processing Equipment" and **A.1.e.** "Electronic Data Processing Data and Media".

**c. Personal Property of Others** that is:

(1) In your care, custody or control; and

(2) Located in or on the building described In the Declarations or in the open (or in a vehicle) within 1,000 feet of the described premises.

However, our payment for loss of or damage to Personal, Property of Others will only be for the account of the owner of the property.

Personal Property of Others does not include "Electronic Data Processing Equipment" or "Electronic Data Processing Data and Media" except as provided under Sections **A.1.d.** "Electronic Data Processing Equipment" and **A.1.e.** "Electronic Data Processing Data and Media".

**d. "Electronic Data Processing Equipment"** that you own or lease, or that is in your care, custody or control, while located in or on the building described in the Declarations or in the open (or in a vehicle) within 1,000 feet of the described premises.

**e. "Electronic Data Processing Data and Media"** that you own or lease, or that is in your care, custody or control, while located in or on the building described in the Declarations or in the open (or in a vehicle) within 1,000 feet of the described premises.

**2. Property Not Covered**

Unless the following property is added by endorsement to this Coverage Form, Covered Property does not include:

a. Accounts, bills, currency, other evidences of debt, money, notes, checks, drafts, securities or food stamps except as provided in the Accounts Receivable Cover-

age Extension. Lottery tickets held for sale are not securities;

b. Live animals, birds or fish, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

c. Automobiles held for sale;

d. Contraband, or property in the course of illegal transportation or trade;

e. The cost of excavations, grading, back filling or filling;

f. Foundations of buildings, structures, machinery or boilers if their foundations are below:

(1) The lowest basement floor; or

(2) The surface of the ground, if there is no basement;

g. Water or land whether in its natural state or otherwise (including land on which the property is located), land improvements, growing crops, standing timber;

h. Aircraft or watercraft (other than watercraft owned by you while out of water at the described premises); and personal property while airborne or waterborne except as provided in the Covered Property In Transit Coverage Extension;

i. Bulkheads, pilings, piers, wharves, docks, dikes or dams;

j. Property that is covered under another Coverage Form of this or any other policy in which it is more specifically described, except for the excess over the amount due (whether you can collect on it or not) from that other insurance;

k. Underground pipes, flues, drains, tanks, tunnels all whether or not connected to buildings; mines or mining property;

l. The cost to research, replace or restore the information on "Valuable Papers and Records", except as provided in the Valuable Papers and Records – Cost of Research Coverage Extension;

m. Vehicles or self-propelled machines that:

(1) Are licensed for use on public roads; or

(2) Are operated principally away from the described premises;

but this paragraph does not apply to:

# INTERLINE
# ENDORSEMENTS

# INTERLINE
# ENDORSEMENTS

002551

COMMERCIAL PROPERTY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TERRORISM RISK
# INSURANCE ACT OF 2002 DISCLOSURE

This endorsement applies to the insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

On December 26, 2007, the President of the United States signed into law amendments to the Terrorism Risk Insurance Act of 2002 (the "Act"), which, among other things, extend the Act and expand its scope. The Act establishes a program under which the Federal Government may partially reimburse "Insured Losses" (as defined in the Act) caused by "acts of terrorism". An "act of terrorism" is defined in Section 102(l) of the Act to mean any act that is certified by the Secretary of the Treasury – in concurrence with the Secretary of State and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The federal government's share of compensation for Insured Losses is 85% of the amount of Insured Losses in excess of each Insurer's statutorily established deductible, subject to the "Program Trigger", (as defined in the Act). In no event, however, will the federal government or any Insurer be required to pay any portion of the amount of aggregate Insured Losses occurring in any one year that exceeds $100,000,000,000, provided that such Insurer has met its deductible. If aggregate Insured Losses exceed $100,000,000,000 in any one year, your coverage may therefore be reduced.

The charge for Insured Losses under this Coverage Part is included in the Coverage Part premium. The charge that has been included for this Coverage Part is indicated below, and does not include any charge for the portion of losses covered by the Federal Government under the Act:

- 7% of your total Commercial Property Coverage Part premium if your primary location is in a Designated City (as listed below).

- 3% of your total Commercial Property Coverage Part premium if your primary location is not in a Designated City (as listed below).

**Designated Cities are:**

| | | | |
|---|---|---|---|
| Albuquerque, NM | El Paso, TX | Miami, FL | San Diego, CA |
| Atlanta, GA | Fort Worth, TX | Milwaukee, WI | San Antonio, TX |
| Austin, TX | Fresno, CA | Minneapolis, MN | San Francisco, CA |
| Baltimore, MD | Honolulu, HI | Nashville-Davidson, TN | San Jose, CA |
| Boston, MA | Houston, TX | New Orleans, LA | Seattle, WA |
| Charlotte, NC | Indianapolis, IN | New York, NY | St. Louis, MO |
| Chicago, IL | Jacksonville, FL | Oakland, CA | Tucson, AZ |
| Cleveland, OH | Kansas City, MO | Oklahoma City, OK | Tulsa, OK |
| Colorado Springs, CO | Las Vegas, NV | Omaha, NE | Virginia Beach, VA |
| Columbus, OH | Long Beach, CA | Philadelphia, PA | Washington, DC |
| Dallas, TX | Los Angeles, CA | Phoenix, AZ | Wichita, KS |
| Denver, CO | Memphis, TN | Portland, OR | |
| Detroit, MI | Mesa, AZ | Sacramento, CA | |

CP T3 81 01 08

002550

b.  We will pay for expenses incurred to re-
move or replace obstructions when re-
pairing or replacing glass that is part of a
building. This does not include removing
or replacing window displays.

This Coverage Extension does not increase
the Limit of Insurance.

## F.  DEFINITIONS

1.  "Pollutants" means any solid, liquid, gaseous
or thermal irritant or contaminant, including
smoke, vapor, soot, fumes, acids, alkalis,
chemicals, waste and any unhealthful or haz-
ardous building material. (Including but not
limited to asbestos and lead products or ma-
terials containing lead.) Waste includes mate-
rials to be recycled, reconditioned or re-
claimed.

2.  "Specified Cause of Loss" means the follow-
ing: Fire; lightning; explosion; windstorm or
hail; smoke; aircraft or vehicles; riot or civil
commotion; vandalism; leakage from fire ex-
tinguishing equipment; sinkhole collapse (as
defined below); volcanic action; falling ob-
jects (as limited below); weight of snow, ice
or sleet; water damage (as defined below), all
only as otherwise insured against in this Cov-
erage Part.

a.  Sinkhole collapse means the sudden
sinking or collapse of land into under-
ground empty spaces created by the ac-
tion of water on limestone or dolomite.
This cause of loss does not include:

(1)  The cost of filling sinkholes; or

(2)  Sinking or collapse of land into man-
made underground cavities.

b.  Falling objects does not include loss or
damage to:

(1)  Personal property in the open; or

(2)  The "interior of a building or struc-
ture", or property inside a building or
structure, unless the roof or an out-
side wall of the building or structure
is first damaged by a falling object.
Any portion of a building or structure
that is within the exterior-facing sur-
face material of a building or struc-

ture shall constitute the interior of
that building or structure.

c.  Water damage means accidental dis-
charge or leakage of water or steam as
the direct result of the breaking apart or
cracking of any part of a system or appli-
ance (other than a sump system includ-
ing its related equipment and parts) that
is located on the described premises and
contains water or steam.

When the Causes of Loss – Earthquake en-
dorsement, Causes of Loss – Earthquake
Sprinkler Leakage endorsement, or Causes
of Loss – Broad Form Flood endorsement is
included in this policy, "specified cause of
loss" also includes such cause of loss, but
only to the extent such cause of loss is in-
sured against under this Coverage Part.

3.  "Vacant" means:

a.  When this policy is issued to a tenant,
and with respect to that tenant's interest
in Covered Property, building means the
unit or suite rented or leased to the ten-
ant. Such building is vacant when it does
not contain enough business personal
property to conduct customary opera-
tions.

b.  When this policy is issued to the owner or
general lessee of a building, building
means the entire building. Such building
is vacant unless at least 31% of its total
square footage is:

(1)  Rented to a lessee or sub-lessee and
used by the lessee or sub-lessee to
conduct its customary operations;
and/or

(2)  Used by the building owner to con-
duct customary operations.

c.  Buildings under construction or renova-
tion are not considered vacant.

4.  "Interior of any building or structure" means
all portions of a building or structure that are
within the exterior facing surface material of
the building or structure.

caved in and can no longer be occupied for its intended purpose, we will also pay for any direct physical loss or damage to Covered Property caused by:

**(1)** Decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

**(2)** Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse; or

**(3)** Use of defective material or methods in construction, remodeling or renovation if the building abruptly falls down or caves in during the course of the construction, remodeling or renovation. However, if the abrupt falling down or caving in of the building occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in **D.2.a., D.2.b. (1)** and **D.2.b.(2)** above, we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling, or renovation, contributes to the abrupt falling down or caving in.

**3.** With respect to the following property:

**a.** Outdoor radio or television antennas (including microwave or satellite dishes) and their lead-in wiring, masts or towers;

**b.** Awnings, gutters and downspouts;

**c.** Yard fixtures;

**d.** Outdoor swimming pools;

**e.** Fences;

**f.** Piers, pilings, wharves, docks, dikes or dams;

**g.** Beach or diving platforms or appurtenances;

**h.** Retaining walls; and

**i.** Walks, roadways and other paved surfaces;

if the collapse is caused by a cause of loss listed in **D. 2.a.(2), D.2.a.(3),** and **D.2.b.(1)** through **D.2.b.(3)** above, we will pay for loss or damage to that property only if:

**a.** Such loss or damage is a direct result of an abrupt falling down or caving in of a covered building or any portion of a cov-

ered building insured under this Coverage Form; and

**b.** The property listed in **3. a.** through **3. i.** above is Covered Property under this Coverage Part.

**4.** If personal property abruptly falls down or caves in and such collapse is not the result of collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

**a.** The collapse was caused by a Cause of Loss listed in **D. 2. a.** and **D. 2. b.** above;

**b.** The personal property which collapses is inside a building; and

**c.** The property which collapses is not of a kind listed in **3.** above, regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph **4.** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

Collapse of personal property does not mean cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**5.** This Additional Coverage - Collapse does not increase the Limits of Insurance provided in this Coverage Part.

**E. ADDITIONAL COVERAGE EXTENSIONS**

**1. Water Damage, Other Liquids, Powder or Molten Material Damage**

If loss or damage caused by or resulting from covered water or other liquid, powder or molten material occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

This Coverage Extension does not increase the Limit of Insurance.

**2. Glass**

In the event of loss or damage to covered glass under this Coverage Part:

**a.** We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed; and