UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA, a Connecticut corporation,<br><br>Plaintiff,<br><br>v.<br><br>WILD WATERS, LLC, an Idaho limited liability company, and RIVER HOUSE, LLC, an Idaho limited liability company,<br><br>Defendant. | Case No. 2:12-cv-00481-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

# INTRODUCTION

Travelers Casualty Insurance Company of America (Travelers), and Defendants Wild Waters, LLC, and River House, LLC (Wild Waters), dispute whether the commercial property insurance policy Wild Waters purchased from Travelers covers a vandalism loss Wild Waters suffered on or about September 1, 2011. Travelers filed a motion for summary judgment on May 15, 2013, seeking a declaration that it has no obligation to provide coverage, and the policy excludes Wild Water's damages. The Court conducted a hearing on July 16, 2013. After carefully considering the parties'

**MEMORANDUM DECISION AND ORDER - 1**

briefs, oral arguments, the evidentiary record, and the relevant authorities, the Court will deny Travelers' motion.

## FACTS[1]

Wild Waters operated a water park in Coeur d'Alene, Idaho. Wild Waters leases the buildings from another entity, the Lavin Family Trust, which owns the water park, and subleases the concessions buildings to River House. Mr. Stacey Lavin was the person responsible for park operations.

Wild Waters customarily operated as a water park open to the public during the summer from Memorial Day in May, to Labor Day in September. Considering the park's location in Northern Idaho, Wild Waters' operation was seasonal, and it closed during the fall, winter, and spring months. At the end of its summer season, park staff would prepare the park for winter, by winterizing the pools, storing equipment, and closing accounts to minimize its expenses during the off season. In March of each year, personnel would prepare to open the park by hiring park personnel, preparing for concession and gift shop sales, and conducting required maintenance and repair of the park facilities, such as gel-coating the waterslides and refinishing the pools.

As early as 2002, Mr. Tim Warner, an insurance broker with Moloney & O'Neill, assisted Mr. Stacy Lavin with obtaining insurance for Wild Waters. (Warner Depo. at 4, 11, Dkt. 29-5.) In 2002, Mr. Warner represented Travelers and presented a quote to Wild Waters for property and casualty insurance. The Travelers policy required renewal on a

---

[1] The Court considers the following facts to be the material and undisputed facts for purposes of deciding the motion.

**MEMORANDUM DECISION AND ORDER - 2**

yearly basis, and expired each year on the 5th of October. (Warner Depo. at 10—12, Dkt. 29-5.)

The Travelers policy issued to Wild Waters covered four buildings leased by Wild Waters. The policy contained a coverage exclusion as follows:

> **C. LIMITATIONS**
> The following limitations apply to all policy forms and endorsements, unless otherwise stated.
> * * * * *
> 5. If the building where loss or damage occurs has been "vacant" for more than 60 consecutive days before loss or damage occurs:
> a. We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss
> (1) Vandalism;
> (2) Sprinkler leakage…;
> (3) Building glass breakage;
> (4) Discharge or leakage of water;
> (5) Theft; or
> (6) Attempted theft.
> * * * * *
> **F. DEFINITIONS**
> 3. "Vacant" means:
>> a. When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations. [2]
>> b. When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:
>>> (1) Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or
>>> (2) Used by the building owner to conduct customary operations.
>> c. Buildings under construction or renovation are not considered vacant.

---

[2] The parties do not contend that section 3(a) applies here.

**MEMORANDUM DECISION AND ORDER - 3**

At the time Mr. Warner began assisting Mr. Lavin with procuring insurance in 2002, they discussed the vacancy clause. The consensus of both Mr. Warner and Mr. Lavin at that time was that Wild Waters was always being used for the business, and would not be considered vacant despite the seasonal closure. (Warner Depo. at 23—24, Dkt. 29-5.)

In the spring of 2010, Mr. Lavin determined the park would not open that summer, because spring weather prevented park personnel from performing necessary preparations and maintenance. Mr. Warner learned that the park would not open for the summer 2010 season in June of 2010, when Mr. Lavin failed to renew the park's separate liability insurance policy covering its summer operations. (Warner Depo. at 28—29, Dkt. 29-5.) As it had done in years prior, Travelers, through Mr. Warner, renewed the commercial property insurance policy effective October 5, 2010.

In March of 2011, a similar situation confronted park personnel regarding the inclement weather, and in May, the decision was made not to open for the 2011 summer season.[3] Again, due to the nonrenewal of the liability insurance policy, Mr. Warner knew the park was not open to the public for the 2011 summer season. During the summer of 2011, Mr. Lavin was occasionally at the park to check on its status. Amy Hensley, the park manager, and Rich Johnson also occasionally checked the park.

---

[3] Travelers cites a newspaper article published July 11, 2010, that recounted financial difficulties facing the park as the reason for its closure. However, the newspaper article does not refute the sworn testimony of Mr. Lavin, who stated that weather prevented necessary repairs. In any event, the dispute regarding the reason for Wild Waters not opening for the summer seasons is not material.

**MEMORANDUM DECISION AND ORDER - 4**

Mr. Lavin became aware of vandalism to the property on September 21, 2011, when he received a telephone call from the local police department stating two suspects had been apprehended. Mr. Lavin was not in Idaho at the time, but he believes the vandalism loss could not have occurred prior to September 1, 2011. Wild Waters gave notice to Travelers of a claim under the insurance contract and Mr. Hal Campbell was assigned to handle the loss claim on behalf of Travelers. Mr. Campbell allegedly informed Mr. Lavin that the loss was covered. Mr. Lavin claims he was unaware of the vacancy provision in the policy. Travelers denied the claim under the vacancy exclusion, because the park had not been open for business since September 2010.

It is Wild Waters' position that it was conducting its customary operations when it made the decision not to open for the 2011 season, because its customary operations included not opening if inclement weather prohibited the necessary preparation and maintenance for the summer season. Travelers, however, contends that Wild Waters was not conducting customary operations because the park was not open to the public during the summer water park season, and therefore had been vacant as defined by the policy for more than sixty consecutive days prior to the loss.

## ANALYSIS

1.  **Summary Judgment Standards**

A principal purpose of summary judgment is to "isolate and dispose of factually unsupported claims ...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually

**MEMORANDUM DECISION AND ORDER - 5**

insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 256–57. The non-moving party must go beyond the pleadings and show "by [its] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324.

The party bearing the burden of proof at trial "must establish beyond controversy every essential element of its ... claim." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003) (adopting decision of district court "as our own"). Because Travelers bears the burden of proving at trial that there is no coverage, to succeed on its

**MEMORANDUM DECISION AND ORDER - 6**

summary judgment motion, it must establish beyond controversy every essential element of its claim.

A party who does not have the burden "may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact." Fed. R. Civ. P. 56(c)(1)(B) (advisory committee's note.) Furthermore, as a general rule, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *S. Cal. Gas Co.*, 336 F.3d at 889.

## 2.  Insurance Contract Interpretation[4]

Insurance policies are contracts between the insurer and the insured. *Mortensen v. Stewart Title Guar. Co.*, 2010 WL 2605798 *3 (Idaho 2010) (citing *Hall v. Farmers Alliance Mut. Ins. Co.*, 179 P.3d 276, 280 (Idaho 2008)). Whether an insurance policy is ambiguous is a question of law over which the court exercises free review. *Armstrong v. Farmers Ins. Co. of Idaho*, 205 P.3d 1203, 1205 (Idaho 2009) (citing *Purvis v. Progressive Cas. Ins. Co.*, 127 P.3d 116, 119 (Idaho 2005)) (citation omitted). If the Court finds the policy language to be unambiguous, the Court is to construe the policy as written, "and the Court by construction cannot create a liability not assumed by the insurer nor make a new contract for the parties, or one different from that plainly intended, nor add words to the contract of insurance to either create or avoid liability." *Id*. "Unless contrary intent is shown, common, non-technical words are given the meaning applied by laymen in daily usage—as opposed to the meaning derived from legal usage—

---

[4] Under *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), the Court must apply Idaho state law to this diversity case. Neither party appears to dispute the application of Idaho law to the case.

**MEMORANDUM DECISION AND ORDER - 7**

in order to effectuate the intent of the parties." *Id.* (quoting *Howard v. Ore. Mut. Ins. Co.*, 46 P.3d 510, 513 (Idaho 2002)). Where there is an ambiguity in an insurance contract, special rules of construction apply to protect the insured. *Id.* at 1206 (citing *Hall*, 179 P.3d at 281).

In determining whether a particular provision is ambiguous, the provision must be read within the context in which it occurs in the policy. *Armstrong*, 205 P.3d at 1206 (citing *Purvis*, 127 P.3d at 119). An insurance policy provision is ambiguous if "it is reasonably subject to conflicting interpretations." *North Pac. Ins. Co. v. Mai*, 939 P.2d 570, 572 (Idaho 1997). If an ambiguity is found, and because insurance contracts are adhesion contracts that are not typically subject to negotiation between the parties, any ambiguity that exists in the contract is construed most strongly against the insurer and in favor of the insured. *Armstrong*, 205 P.3d at 1206 (citing *Arreguin v. Farmers Ins. Co.*, 180 P.3d 498, 500 (Idaho 2008)). The Court also is to construe insurance contracts "in a manner which will provide full coverage for the indicated risks rather than to narrow its protection." *Smith v. O/P Transp.*, 918 P.2d 281, 284 (Idaho 1996). "The burden is on the insurer to use clear and precise language if it wishes to restrict the scope of its coverage." *Arreguin*, 180 P.3d at 500.

3.     **The Policy is Not Ambiguous**

The Court finds the Policy, when taken as a whole, is not ambiguous. Nor do the parties appear to contend that that the vacancy provision is ambiguous. Rather, the parties argue instead about whether Wild Waters was conducting its customary operations, which operations include being closed, such that Wild Waters was not "vacant" under the

**MEMORANDUM DECISION AND ORDER - 8**

terms of the policy for sixty days prior to the loss. Travelers asserts that, because the park was closed during a time when it customarily would be open, and had not operated as a water park for two summer seasons, the park was vacant at the time of the loss and for the sixty day period prior to the loss. Thus, Travelers contends that the exception to coverage applies.

Travelers relies upon four cases to support its position that Wild Waters' closure during the summer water park season renders the vacancy clause applicable. First, in *Bellevue Roller-Mill Co. v. London & L. Fire Ins. Co.*, 39 P.196 (Idaho 1895), a case that remains viable today, the Idaho Supreme Court considered whether a mill run by water power that shut down its operations during the winter was vacant under the terms of an insurance policy. In *Bellevue*, the insurance company issued a policy that was void if a covered building had become "vacant or unoccupied and remained so for ten days." The insurance company knew the mill could not be operated during cold weather, and had not been operated during certain months in each previous year, but issued the policy. A fire caused a loss during the winter closure.

The court held that, having known of the winter closure, the insurance company waived its right to rely upon the vacancy clause, and was estopped from repudiating the contract. *Bellevue*, 39 P. at 198. The court explained that nonoperation of the mill during the winter was "incident to use of the mill, and taken into consideration by the insurance company when it issued said policy for a period covering or including the time of such nonoperation of the policy." *Id.* The court described other situations where closures or nonoccupation were incident to use—for example, a church that only conducted services

**MEMORANDUM DECISION AND ORDER - 9**

on Sunday, or a schoolhouse that was unoccupied during vacations. *Id.* Therefore, the vacancy provision was waived, and the loss that occurred due to the fire was covered.

Similarly, in *Keren Habinyon Hachudosh D'Rabeinu Yoel v. Philadelphia Indemnity Ins. Co.*, 462 Fed. Appx. 70 (2nd Cir. 2012),[5] an insurer excepted from coverage any loss that occurred if the building had been vacant for more than 60 consecutive days before the loss. "Vacant" was defined as a building in which the owner did not use at least 31% of the total square footage of the building to conduct its "customary operations" within 60 days of the incident. *Keren*, 462 Fed. Appx. at 72. The building was insured as a school, but no students had been enrolled, and the buildings were primarily being used for storage of school supplies, furniture, and computers. In defining the word "customary," the court relied upon the context. In *Keren*, the building was insured as a high school, so customary operations meant the activity of operating a school. *Id.* at 73. The court held that the vacancy provision applied, and the loss was not covered, because the building had not been used as a school for over a year. *Id.* at 72. The court further explained that mere access to, or incidental use (such as for meetings) did not constitute "customary operations." *Id.* at 73—74.

In *Oakdale Mall Assoc. v. Cincinnati Ins. Co.*, 702 F.3d 1119 (8th Cir. 2012), the court confronted a vacancy clause similar to the one in Wild Waters' policy that applied to a shopping mall. The mall was deemed vacant unless at least 31% of its total square footage was "rented to a lessee or sub-lessee and used by them to conduct their customary operations; or used by the building owner to conduct customary operations."

---

[5] This case was not selected for publication in the Federal Reporter.

**MEMORANDUM DECISION AND ORDER - 10**

The mall in this case had only four operating tenants occupying less than 31% of the total mall square footage. Other tenants "occupied" space, but were not actually open for business. The mall argued, however, that it was actively seeking mall tenants to occupy the space. The court rejected the mall's argument, explaining that if its contention were accepted, then a mall that was completely vacant with a large sign outside that said "for lease" would be deemed fully occupied for purposes of the vacancy provision in the insurance policy, which was an absurd result. *Oakdale*, 702 F.3d. at 1124. Nor did other tenants' use of their space for storage constitute "customary operations" of that tenant's business such that the mall could overcome the vacancy provision. *Id.* The mall's business, the court explained, was not that of a lessor---but that of a shopping mall. *Id.* at 1124—25. And if there were no tenants in the mall operating retail or other businesses, the vacancy clause was considered applicable.

Finally, the last case cited is another unpublished decision from the Southern District of Florida, *JJD Assoc. of Palm Beach, LTD. v. Am. Empire Surplus lines Ins. Co.*, No. 11-80247, 2011 WL 5873001 (S.D. Fla. Nov. 22, 2011). Again, the vacancy clause provided that the building covered by the policy was deemed vacant unless at least 31% of its total square footage was rented to a lessee and "used by the lessee to conduct its customary operations; and/or used by the building owner to conduct customary operations." 2011 WL 5873001 at *1. The covered property was a shopping center with seven sub-properties, and the vandalized building was vacant for the sixty days prior to the loss. The court explained that each sub-property or building had to be occupied under the facts of this case. *Id.* at *2. As a means of disputing the vacancy provision, the

**MEMORANDUM DECISION AND ORDER - 11**

building tenant explained that maintenance personnel frequented the premises where the loss occurred, and stored materials. However, the court rejected that argument, because "customary operations" of a shopping center did not include storage of tools and sporadic entry for maintenance purposes. *Id.* at *3.

Wild Waters attempts to distinguish the above cited cases, explaining that Travelers knew the water park was seasonal, and that from the inception of the policy, Wild Waters never changed the nature and character of its use as a water park. Rather, it had simply not opened to admit customers because of inclement weather, but the activities of preparation and maintenance had continued and the park was ready for seasonal opening, weather permitting. Wild Waters argues that seasonal "waxing and waning" in Wild Waters' operations was "customary," and noted that Mark Franken with Travelers "acknowledged that had the waterslide park opened for the season, a vandalism loss during the winter would be within customary operations." (Mem. at 5, Dkt. 29.) Wild Waters cites *Bellevue* as the most analogous to the facts of this matter.

The problem with Wild Waters' argument and reliance upon *Bellevue* is that Wild Waters' loss did not occur during its customary closure period, but rather during the summer, when it normally would be open to the public as a water park. Wild Waters had not opened for business as a water park to the public for two consecutive summers prior to the loss on September 1, 2011. Although Tim Warner, the agent who procured the insurance policy for Wild Waters, knew the park would be vacant during the winter months, and was of the opinion that winter closure was part of Wild Waters' customary

**MEMORANDUM DECISION AND ORDER - 12**

operations, that is no different than the mill in *Bellevue* closing during the winter and reopening during the summer, just as Wild Waters was supposed to do.

One distinguishing factor, however, is that in *Bellevue*, the mill suffered its loss during the winter, whereas here, the loss occurred just after Wild Waters' second summer season, a time when it was supposed to be open to the public. Wild Waters can certainly have periods of closure, and there is no doubt from the record that Travelers had to have known of that fact given Wild Waters' location in Northern Idaho. But Wild Waters' loss did not occur during its "usual and customary" winter closure period for normal maintenance and repair operations, but instead just after it was supposed to be open for the summer season. Wild Waters was not, therefore, engaged in its customary operations at the time of the loss, or for the sixty days prior to the loss.

Like the school in *Keren*, Wild Waters could certainly have periods of customary closure and remain engaged in its usual and customary operations. But it had not operated as a water park, or been open to the public, for two consecutive summers. As in *JJD Assoc. of Palm Beach*, mere incidental use as a storage facility and the performance of occasional maintenance does not constitute customary operations. And, as in *Oakdale,* if Wild Waters' premise were accepted---that at any moment it could open to the public had weather permitted---then Wild Waters could remained shuttered yet still be covered even though it had not opened as a water park and did not intend to do so. Wild Waters was in the business to open a water park each summer. It did not open for summer 2010 or summer 2011.

**MEMORANDUM DECISION AND ORDER - 13**

But the above analysis does not end the Court's inquiry in this case, and does not result in summary judgment for Travelers under the facts presented.

4.   **Waiver or Estoppel**

Wild Waters argues that Travelers either waived or should be estopped from applying the vacancy clause to deny coverage, because Mr. Warner, the insurance agent, knowing that Wild Waters would be closed periodically, had procured a renewal of the Travelers policy each year. Further, Wild Waters contends that, during the loss investigation, Mr. Lavin was told that the claim was valid. Thus, Wild Waters contends that, like in *Bellevue*, Travelers waived or should be estopped from applying the vacancy provision because it knew that the park's customary operations included not being open for the public's use.

In *Shoup v. Union Security Life Ins. Co.*, 124 P.3d 1038 (Idaho 2005), the court explained the components of estoppel in the insurance context. The court explained that an insurance company is estopped to deny liability for which it contracted if the insured reasonably relied upon the promises of or agreements with the soliciting representative of the insurance company, and the company profits from the change in its position. *Shoup*, 124 P.3d at 1031. Generally, it is not the obligation of the insured to determine if he is issued a policy under the insurer's rules, *Id.* at 1031, but he does have an obligation to read his policy and not blindly rely upon the subjective impressions he may have obtained in talking with an agent, *Foster v. Johnstone*, 685 P.2d 802, 808 (Idaho 1984).

In applying *Bellevue* and *Shoup*, there are additional facts important here. During the summer of 2010, Mr. Warner knew the park was not open during its customary

**MEMORANDUM DECISION AND ORDER - 14**

summer season. But in October of 2010, Mr. Warner procured a renewal of the Travelers policy for another year. Mr. Lavin testified that the park was weather dependent, and therefore there was no guarantee the park would open the following summer.

Travelers argues that Mr. Warner, who operated as an insurance broker and not as an agent of Travelers, does not represent Travelers and therefore his statements or knowledge cannot form the basis of an estoppel claim. Mr. Warner indicated in his deposition that he procured Wild Waters' general liability insurance through a wholesaler, and the request went to many markets. But when asked whether he "represented an insurance company" when he presented a quote to Wild Waters, Mr. Warner answered, "yes." (Decl. of Hedberg, Ex. 2, Warner Depo. at 10, Dkt. 32-2.) An insurance broker, as distinguished from an agent, does not represent an insurance company but places insurance with whatever company he can that is willing to insure the risk. He is not, therefore, an agent of the insurer, but instead is an agent of the person seeking insurance. *Arley v. United Pacific Ins. Co.*, 379 F.2d 183, 188 n.5 (9th Cir. 1967.) It is unclear from the record whether Mr. Warner was a broker or an agent, and whether, because he knew of the park's closure during summer of 2010 yet procured renewal of the Travelers policy, as he did every year since 2002, his knowledge should be attributed to Travelers.

With these additional facts, this case is analogous to *Bellevue.* In *Bellevue,* the loss occurred during the winter months when the water was frozen and the insurer (or its agent) knew the mill could not operate. Yet, the insurer issued the policy with the vacancy exclusion, knowing of the routine and customary closure during winter months.

**MEMORANDUM DECISION AND ORDER - 15**

Under those circumstances, the court found waiver, and prevented application of the vacancy provision when the loss occurred during the winter closure period.

Here, the critical fact precluding summary judgment is the park's closure during the summer of 2010, just prior to the renewal date in October of 2010 for the following year's operations. The facts are disputed whether Travelers, by and through Mr. Warner, knew the park had been closed to the public during the summer of 2010.[6] Yet, Travelers, through Mr. Warner's efforts, renewed the policy in October 2010. Under these facts, Travelers cannot meet its burden. By renewing the policy after a summer season when the park should have been open, the vacancy provision presumably would have operated to preclude coverage from and after the policy renewal date. The park had not been used to conduct customary operations in the sixty days prior to renewal, and would be closed during the 2010-2011 winter season.

During normal operations and following a successful summer season, there is no dispute that Mr. Lavin and Mr. Warner understood that the park would be closed for the winter months, and that such closure was incidental to Wild Waters' operation as a seasonal business. The parties presumed that under normal operations (seasonal operation), the vacancy clause would not be effective if a loss occurred during the winter months. But there is no evidence in the record that the parties understood the effect of the vacancy clause if the park had not opened to the public as was customary during the summer season. Construing the evidence in favor of Wild Waters, as it must, the Court

---

[6] There is no dispute Mr. Warner knew of the summer closure in 2010. But because the record is not clear concerning the relationship of Mr. Warner to Travelers, the Court cannot conclude as a matter of law that Travelers knew of that fact.

**MEMORANDUM DECISION AND ORDER - 16**

can reasonably infer that Wild Waters believed it was covered under the Travelers policy because its winter closure was incidental to its customary operations, and had no reason to believe the 2010 summer closure precluded coverage upon renewal in October of 2010.

Under the circumstances here, the insurer should not benefit from renewal of its policy when the disputed facts raise an inference that it knew the park had been closed prior to renewal, and the vacancy clause may be immediately operable such that coverage for the entire policy period was precluded under the vacancy clause.[7] Such were the facts in *Bellevue,* where the court found the insurer had waived application of the vacancy provision. The court commented that when an insurer issues a policy with full notice of all the facts in the case, and "has received a party's money under circumstances leading him to suppose he is receiving indemnity," the insurer is estopped from repudiating the contract. Although the Court stops short of finding waiver or estoppel, the Court concludes that Travelers has not met its burden of demonstrating the absence of a genuine issue of material fact on the issue of waiver or estoppel.

## CONCLUSION

For the reasons explained above, the Court concludes that the policy provision is not ambiguous. Under the facts, Travelers has not met its burden of demonstrating the absence of a genuine issue of material fact on every essential element of its claim. Wild

---

[7] The Court focuses instead on the closure during summer 2010, not summer 2011. Because of the summer 2010 closure, there arguably was no coverage from the inception of the policy. Under the facts and the inference drawn by the Court, coverage would be provided for the 2010-2011 season only if the loss had occurred sixty one days after the park had opened to the public for the summer of 2011. But, according to Mr. Lavin, weather could prevent the park from opening, and there was no guarantee (just an assumption) that the park would open the following summer in 2011.

**MEMORANDUM DECISION AND ORDER - 17**

Waters has established that a genuine issue of material fact exists regarding its defense of estoppel or waiver, and therefore the Court will deny Travelers' motion for summary judgment.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED:

1) Plaintiff's Motion for Summary Judgment (Dkt. 24) is **DENIED.**

Dated: **August 30, 2013**

Honorable Candy W. Dale
United States Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 18**